[No. C040668. Third Dist. June 3, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT JAMES BARRETT, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, III, IV, and V.

438

**COUNSEL**

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Stan Cross and Daniel Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, Acting P. J.**—Defendant Scott James Barrett challenges his conviction of committing gross vehicular manslaughter and driving under the influence. Except to remand the matter for a hearing on victim restitution, we affirm the judgment.

### PROCEDURAL HISTORY

By information filed February 6, 1998, the People charged defendant with the following crimes stemming from a fatal automobile accident on January 25, 1997: as count 1, gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)); as count 2, driving under the influence of alcohol causing injury (Veh. Code, § 23153, subd. (a)); and as count 3, driving with a blood-alcohol level of 0.08 percent or more, causing injury (Veh. Code, § 23153, subd. (b)).

As enhancements, the information also alleged the following: As to count 1, defendant had suffered one or more prior convictions of driving under the influence of alcohol (Pen. Code, § 191.5, subd. (d), which mandates a sentence of 15 years to life); and as to counts 2 and 3, defendant had suffered two separate violations for driving under the influence of alcohol (former Veh. Code, § 23190, subd. (a)), defendant caused death or great bodily injury to six persons (Veh. Code, § 23182), and defendant inflicted great bodily injury upon four persons (Pen. Code, § 12022.7, subd. (a)).

Following trial, a jury found defendant guilty on all three counts. On counts 2 and 3, the jury also found true the multiple-victim enhancements for all six victims, and found true the great bodily injury enhancements for three of the four alleged victims.

The court found not true the prior conviction enhancement alleged in count 1. However, the court found true the prior conviction enhancements alleged in counts 2 and 3.

The court subsequently sentenced defendant to a state prison term of 11 years, calculated as follows: the middle term of three years on count 2 (driving under the influence causing injury), plus three years each for two of the great bodily injury enhancements; and a consecutive, subordinate term of two years (one-third the middle term) on count 1 (gross vehicular manslaughter).

The court imposed a three-year term on count 3, but stayed that term under Penal Code section 654. The court struck the multiple-victim enhancement in count 2 because it relied on the infliction of great bodily injury upon

multiple victims as an aggravating factor in that count. The court also did not impose a great bodily injury enhancement for the victim killed in the accident because his death was used as an aggravating factor in count 1.

The court also imposed separate $200 restitution fines under Penal Code sections 1202.4, subdivision (b), and 1202.45, but stayed the latter pending successful completion of parole. In addition, the court ordered victim restitution pursuant to Penal Code section 1202.4, subdivision (f), in the amount of $1,744.13.

On appeal, defendant alleges the following:

1. The prosecution's delay in filing the complaint violated defendant's constitutional right to due process by preventing access to potentially exculpatory evidence, namely, the vehicles involved in the collision;

2. The trial court erred in admitting into evidence records and testimony concerning defendant's prior participation in a drinking driver program;

3. The trial court erred in admitting evidence of a prior DUI conviction and the circumstances surrounding a collision that ultimately led to another DUI conviction;

4. The alleged errors constituted cumulative prejudicial error; and

5. The trial court denied defendant a meaningful opportunity to contest the amount of restitution ordered.

FACTS

1. *The January 25, 1997, collision*

Defendant worked the night shift at a Lucky grocery store in Vacaville on January 24, 1997. After completing work at 7:00 a.m. the morning of the 25th, defendant telephoned his girlfriend, Lori Acosta, and informed her he and his friends were going out drinking. When defendant arrived at Acosta's apartment in Woodland later that day, he was loud, obnoxious, and drunk. He continued to drink at her apartment, then went to bed about 7:00 p.m.

Acosta woke defendant around 10:00 p.m. that same evening because he had to be back at work in Vacaville by 11:00 p.m. She made him take a shower; "He was out. He wasn't even awake." Defendant then left for work, driving Acosta's red Jeep Cherokee. There was a storm outside when defendant left, and some roads were flooded.

Earlier that day, a county public works official had noticed some flooding on County Road 98 just south of County Road 30. County Road 98 runs between Davis and Woodland. The official placed flood warning signs directed at both directions of traffic. The official placed the sign for southbound traffic along County Road 98 about 10 feet south of its intersection with County Road 30. The official placed the sign for northbound traffic along County Road 98 about one-tenth of a mile south of the flooded area.

Later that evening, Jose Serrano was driving his family home to Woodland. They were returning from San Francisco International Airport where they had picked up Jose's brother and his family. The party of eight crowded into Jose's black Cadillac. In the front seat with Jose were his wife, Teresa; his 16-month-old son, Christian; his sister-in-law, Leticia; and Leticia's nine-month-old daughter, Alisa. Three additional passengers rode in the backseat: Jose's brother, Raul; Raul's two-and-a-half-year-old daughter, Carmen; and Jose's three-year-old daughter, Maria. Only two people in the car were wearing seat belts: Jose, the driver; and Maria, who was strapped into a child car seat.

Jose was driving north on County Road 98 between Davis and Woodland. It was dark, and raining hard. Jose stopped at a stop sign, continued driving, then decelerated as he approached a sign warning of flooding ahead. He started to accelerate again; Raul estimated they were traveling between 25 and 30 miles per hour at this time.

Suddenly, an oncoming car veered into their lane, going around a pool of water in the southbound lane, and spraying water from the left wheels. Jose hit the brakes, exclaiming, "Son of a bitch, he's gonna get us." Jose tried steering the car toward the right shoulder to avoid a collision, but the oncoming car was approaching too fast. It struck Jose's car in the northbound lane.

The impact killed Jose immediately. Teresa suffered a fractured kneecap. Raul fractured his hip. Maria sustained a broken arm. Christian suffered a concussion. Leticia incurred a laceration on her forehead, requiring stitches. Alisa had superficial abrasions, and Carmen suffered no injuries.

Barry Wallace was driving northbound on County Road 98 at the time. He had driven the road earlier that evening going south. At that time, he had passed a sign near the intersection with County Road 30 that read, "Flooded." He slowed down from 50 to 55 miles per hour to about 20 to 25 miles per hour. When he saw the water in the roadway, he stopped, then drove through it about five miles per hour because he did not want to drive in the opposite lane of traffic.

Returning home and driving north on County Road 98 later that evening, Wallace saw a black Cadillac in the northbound lane that had been in an accident. The Cadillac was in the middle of the flooded area. Wallace also saw a red Jeep Cherokee wrapped around a telephone pole.

Wallace called 911 and ran to the Jeep to assist the driver. Defendant was in the Jeep's driver seat, yelling, "Get me out. Help me." His speech was slurred. Police and fire personnel arrived and extracted defendant from the Jeep. Defendant was combative and smelled of alcohol. His eyes were bloodshot.

Defendant was transported to a hospital, where a blood sample was taken at 11:45 p.m. His blood-alcohol level was 0.13 percent. A criminalist testified if defendant consumed his last drink at 7:00 p.m., his blood-alcohol level at the time of the collision could have been as high as 0.17 percent.

2. *Reconstruction of the collision*

California Highway Patrol Officer George Reese was the primary accident investigator. When he arrived at the scene at 10:05 p.m., the rain was "pouring." The Cadillac had come to a stop along the east shoulder of the northbound lane, while the Jeep stopped in a pool of water along the west shoulder near a telephone pole. Based on the damage to the vehicles and his experience, Reese estimated the total impact speed was about 100 miles per hour, with one car traveling between 50 and 60 miles per hour and the other traveling at about 40 miles per hour.

The collision appeared to have been head-on, with the Jeep's left front headlight colliding with the Cadillac's left front headlight. Relying on the location of debris and witnesses' statements, Reese concluded the collision occurred in the northbound lane, a few feet from the centerline, when the Jeep veered into that lane to avoid the flooding in the southbound lane.

Reese saw the flood warning signs along County Road 98, and observed both could be read by oncoming traffic about 200 feet away. The sign along the southbound lane in which defendant had driven was about 550 feet before the water in the roadway. Reese opined a safe driving speed for County Road 98 under rainy conditions that night was 40 miles per hour, and a safe speed after seeing the flood warning signs would have been five miles per hour.

He thus concluded the Jeep's estimated speed of 50 to 60 miles per hour was unsafe for the conditions that evening. Had defendant driven at a safe

speed, Reese believed there was "more than enough" time for him to stop before encountering the flooded roadway. Reese also concluded defendant was driving under the influence of alcohol, and defendant had violated Vehicle Code section 21650, subdivision (a), by driving on the wrong side of the road.

California Highway Patrol (CHP) accident reconstruction investigator Christopher Port testified there were two possible areas of impact, both in the northbound lane. Under one scenario, the Jeep would have been traveling at 59 miles per hour, while the Cadillac would have been traveling at 48 miles per hour. Under the other scenario, the Jeep would have been traveling at 63 miles per hour, and the Cadillac would have been traveling at 42 miles per hour. Port opined the collision was head-on, and neither vehicle swerved prior to the collision to avoid impact.

The vehicles were not impounded by the CHP and had been destroyed by the time of trial.

### 3. *Defendant's prior arrests*

The trial court admitted evidence of two prior incidents where defendant was arrested for driving under the influence of alcohol. The evidence was admitted for the limited purpose of establishing defendant's state of mind at the time of the January 25, 1997, fatal accident.

The first arrest resulted in defendant being convicted on May 17, 1993, in Placer County for violating Vehicle Code section 23152, subdivision (a). The court placed defendant on three years' probation and ordered him to enroll in a program for first-time DUI offenders. The program included many hours of instruction and discussion on the dangers of drinking and driving and the medical, emotional and social problems caused by alcohol. Defendant successfully completed the program.

The second arrest occurred on December 22, 1996, a mere one month before the accident here at issue. In that case, defendant was driving a Ford Bronco that crashed into a parked car, causing the parked car to collide with another parked car. A Woodland police officer found defendant drunk at Acosta's apartment. Defendant stated he knew why the officer was there: "I fucked up and hit some cars." Defendant failed field sobriety tests. Preliminary alcohol screening tests indicated defendant's blood-alcohol level was at 0.23 percent and 0.24 percent.

The officer arrested defendant and took him to the police station. There, breathalyzer tests were administered. They indicated defendant's blood-alcohol level was 0.24 percent and 0.26 percent. After waiving his rights

under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], defendant admitted colliding with the parked car. He left the scene of the accident because he knew he was drunk. He also stated he knew he had an alcohol problem, and he had "fucked up bad."

Defendant was ultimately convicted of driving under the influence on June 5, 1997.

### 4. *The defense*

Relevant to the arguments raised on appeal was the testimony of Philip O'Sullivan, a retired CHP accident reconstruction investigator. O'Sullivan reviewed the investigation reports, 150 photographs, preliminary hearing transcripts, and the trial testimony of the prosecution's reconstruction experts, Officer Reese and Investigator Port. Based on this review, O'Sullivan concluded there was insufficient evidence from the scene to determine either the speed of the vehicles at the time of the collision or the point of impact. He stated even if the cars were still available for inspection, their speeds could not be determined because of the unknown influence of the water on the roadway.

O'Sullivan opined the photographs showed the accident was not a total head-on impact, but was a left-side to left-side impact. Based on the trial testimony, O'Sullivan asserted a belief defendant did not intentionally steer the Jeep into the northbound lane. O'Sullivan also asserted a belief the Jeep hit the water, hydroplaned, and crossed over into the northbound lane.

In O'Sullivan's opinion, the collision was caused by the placement of the flood warning signs. He stated the placement of the signs violated requirements of the California Department of Transportation and the United States Department of Transportation. Given the flooded condition of the road, O'Sullivan believed the road should have been closed in both directions, or a traffic control system should have been used to allow drivers to circumvent the flooded areas and take turns safely driving in the nonflooded lane. On cross-examination, O'Sullivan insisted defendant's intoxication had nothing to do with the accident.

### DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 437.

## II

### Records and Testimony of Defendant's Participation in County Drinking Driver Program

Defendant claims the prosecution unlawfully obtained copies of records documenting his participation in a drinking driver program. He also claims the trial court committed prejudicial error by admitting those documents and testimony concerning the documents and the program into evidence. We disagree.

### A. Procedural and factual background

On October 17, 2001, the prosecutor sought a subpoena duces tecum from the trial court to obtain all records relating to the defendant in the custody of the Yolo County Alcohol, Drug and Mental Health Department. A sealed record containing the records arrived at the court on October 24, 2001. On October 30, 2001, defendant's trial counsel stipulated the prosecutor could inspect the records on condition copies were provided to him. The prosecutor inspected the records and gave copies to defense counsel. Defense counsel later stated that at the time he agreed to the stipulation, he did not intend to waive any rights of confidentiality, he did not know what was in the envelope until he opened it, and he was "just trying to expedite things."

Prior to trial, the prosecution filed a motion in limine to introduce evidence of defendant's 1993 and 1997 DUI convictions and his participation in a Yolo County DUI education program from May 1993 through February 1994. Defendant opposed, arguing his DUI program records were privileged under Health and Safety Code section 11977. That statute concerns the confidentiality of patient records maintained in connection with any state "drug abuse treatment or prevention effort or function . . . ." (Health & Saf. Code, § 11977, subd. (a).) It prohibits the release of such patient records by a court absent a search warrant and appointment of a special master pursuant to Penal Code section 1524, subdivision (c). (Health & Saf. Code, § 11977, subd. (c)(5).)[1]

On the first day of trial, the court ruled the prosecution could introduce the fact defendant was convicted of DUI in 1993, and the circumstances which

---

[1]Health and Safety Code section 11977 reads in pertinent part: "(a) The identity and records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any drug abuse treatment or prevention effort or function conducted, regulated, or directly or indirectly assisted by the department shall, except as provided in subdivision (c), be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subdivision (b).

"(b) The content of any records referred to in subdivision (a) may be disclosed in accordance with the prior written consent of the client with respect to whom the record is

led to his arrest for DUI in 1996, but not the fact of his conviction for that latter instance. The court also ruled evidence of defendant's participation in the DUI program was privileged under Health and Safety Code section 11977 and thus was not admissible because the prosecution had not laid a proper foundation by complying with the requirements of Penal Code section 1524, subdivision (c).[2] However, the court added it would admit the evidence if the prosecution could lay a proper foundation because federal regulations on confidentiality had been satisfied.

Two days later, the trial court reconsidered its ruling on the admissibility of the DUI program records. Upon further review, the court concluded the DUI program was not governed by Health and Safety Code section 11977. Instead, it was governed by regulations implementing Health and Safety Code sections 11836 and 11837. These statutes regulate the licensure and operation of DUI programs. Regulations implementing these statutes require DUI programs to assure the confidentiality of participant records *not* by complying with Penal Code section 1524, but rather by complying with 42 Code of Federal Regulations parts 2.1 through 2.67(1) (2002). (Cal. Code Regs., tit. 9, § 9866.)

maintained, but only to the extent, and under the circumstances, and for the purposes as clearly stated in the release of information signed by the client.

"(c) Whether or not the client, with respect to whom any given record referred to in subdivision (a) is maintained gives his or her written consent, the content of the record may be disclosed as follows: [¶] . . . [¶]

"(5) If authorized by a court of competent jurisdiction granted after application showing probable cause therefor, as provided in subdivision (c) of Section 1524 of the Penal Code.

"(d) Except as authorized by a court order granted under paragraph (5) of subdivision (c), no record referred to in subdivision (a) may be used to initiate or substantiate any criminal charges against a client or to conduct any investigation of a client.

"(e) The prohibitions of this section shall continue to apply to records concerning any individual who has been a client, irrespective of whether he or she ceases to be a client."

[2] Penal Code section 1524, subdivision (c), states in relevant part: "[N]o search warrant shall issue for any documentary evidence in the possession or under the control of any person, who is a lawyer as defined in Section 950 of the Evidence Code, a physician as defined in Section 990 of the Evidence Code, a psychotherapist as defined in Section 1010 of the Evidence Code, or a clergyman as defined in Section 1030 of the Evidence Code, and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with:

"(1) At the time of the issuance of the warrant the court shall appoint a special master in accordance with subdivision (d) to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant.

"(2) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing."

However, the court ruled the prosecutor still could not introduce defendant's records because the prosecutor had not satisfied the procedures established in the federal regulations for obtaining the documents. Those procedures required the requesting party to file an application with the court using a fictitious name to represent the person whose records were being sought.[3] The procedures also required the person holding the records to be given notice of the application and the right to a hearing on whether the criteria for releasing the documents had been met.[4] The court stated the issue was ongoing and would remain open until the prosecution completed its case-in-chief.

Subsequently, during the prosecution's case-in-chief, the prosecutor filed a written application for a court order authorizing disclosure and use of records of "John Doe's" participation in the Yolo County DUI program. The application asserted the prosecution had fulfilled the notice requirements by its earlier subpoena duces tecum, which gave the holder of the records notice of the request for documents and the opportunity to have a hearing and be represented by independent counsel.

Defendant opposed granting the application. He argued the federal regulations required unconditional compliance with their requirements. The subsequent filing of an application in the name of John Doe could not, he argued, cure the damage caused by obtaining these documents by means of the identifying subpoena duces tecum.[5]

On December 4, 2001, the trial court granted the prosecution's application. As to the defendant's objection, the court stated: "I agree with [defense

[3]The application requirements are as follows: "An order authorizing the disclosure or use of patient records to criminally investigate or prosecute a patient may be applied for by the person holding the records or by any person conducting investigative or prosecutorial activities with respect to the enforcement of criminal laws. The application may be filed separately, as part of an application for a subpoena or other compulsory process, or in a pending criminal action. An application must use a fictitious name such as John Doe, to refer to any patient and may not contain or otherwise disclose patient identifying information unless the court has ordered the record of the proceeding sealed from public scrutiny." (42 C.F.R. § 2.65(a) (2002).)

[4]The notice requirements state: "Unless an order under § 2.66 is sought with an order under this section, the person holding the records must be given:

"(1) Adequate notice (in a manner which will not disclose patient identifying information to third parties) of an application by a person performing a law enforcement function;

"(2) An opportunity to appear and be heard for the limited purpose of providing evidence on the statutory and regulatory criteria for the issuance of the court order; and

"(3) An opportunity to be represented by counsel independent of counsel for an applicant who is a person performing a law enforcement function." (42 C.F.R. § 2.65(b) (2002).)

[5]On this point, the federal regulations state: "Unconditional compliance required. The restrictions on disclosure and use in these regulations apply whether the holder of the information believes that the person seeking the information already has it, has other means of obtaining it, is a law enforcement or other official, has obtained a subpoena, or asserts any

counsel] that the records previously delivered to the Court were delivered before the proper application was made, and therefore those records should not be disclosed to the jury. However, that is not to say that if a custodian of the records appears in court and authenticates records concerning the Defendant's participation in a multiple offender drinking driver program in Yolo County that that testimony would be precluded under [42 Code of Federal Regulations part] 2.65 or any other statute, that testimony would be relevant and admissible as long as the proper foundation has been laid."

The following day, Sandra Holguin, a records clerk with Yolo County Alcohol, Drug and Mental Health Services' DUI department, identified records concerning defendant's participation in her department's "First Offender Program." The records were later admitted into evidence. Holguin testified defendant was enrolled in the First Offender Program on May 18, 1993, and he completed the program on February 4, 1994.

Kerri DeWein next testified. Yolo County Alcohol, Drug and Mental Health Services employed DeWein as a "life skills coach." She explained the First Offender Program was a four-month program that had three components: group sessions, monitoring sessions, and education sessions. The group sessions were held with up to 15 program participants and one facilitator meeting together in nine 2-hour sessions to discuss such topics as the dangers of drinking and driving and the difference between social drinking and addiction.

During the monitoring sessions, a program participant would meet one-on-one with a facilitator who would ask the participant about his drinking and driving habits and inquire as to the status of his court cases, including the payment of fines. These sessions occurred four times during the program.

The education sessions were two-hour meetings held six times during the program where participants would learn about blood-alcohol levels, the dangers of drinking and driving, physical effects of alcohol on the brain and other vital organs, and the emotional, social, and spiritual problems caused by alcohol.

In connection with the testimony of these two witnesses and the admission of defendant's records, the court instructed the jury that any evidence defendant participated in a DUI program could be considered only for the limited purpose of determining defendant's state of mind at the time of the accident.

other justification for a disclosure or use which is not permitted by these regulations." (42 C.F.R. § 2.13(b) (2002).)

B. *Discussion*

 Defendant raises two arguments. He first asserts the court erred by determining on reconsideration that the release of his records was not subject to Health and Safety Code section 11977. Second, he claims if the federal regulations apply, the prosecution failed to comply with their requirements. We address each argument.

1. *DUI program records were not subject to Health and Safety Code section 11977*

The trial court correctly determined defendant's DUI program records were not subject to Health and Safety Code section 11977. Section 11977 concerns records of "any *drug abuse treatment or prevention effort or function* conducted, regulated, or directly or indirectly assisted" by the state Department of Alcohol and Drug Programs. (Italics added.) It falls within part 3, division 10.5, of the Health and Safety Code, a part entitled "State Government's Role to Alleviate Problems Related to the Use and Abuse of Drugs." (Health & Saf. Code, § 11860 et seq.)

For purposes of section 11977, a "narcotic and drug abuse program" means "any program which provides any service of care, treatment, rehabilitation, counseling, vocational training, self-improvement classes or courses, replacement narcotic therapy in maintenance or detoxification treatment, or other medication services for detoxification and treatment, and any other services which are . . . intended in any way to alleviate the problems of narcotic addiction or habituation or drug abuse addiction or habituation or any problems in whole or in part related to the problem of narcotics addiction or drug abuse, or any combination of these problems." (Health & Saf. Code, § 11970.5.)

In contrast, county drinking driver programs are defined and regulated in part 2 of division 10.5 of the Health and Safety Code. Part 2 is entitled, "State Government's Role to Alleviate Problems Related to the Inappropriate Use of Alcoholic Beverages." (Health & Saf. Code, § 11760 et seq.) For purposes of this part, a "Driving-Under-the-Influence Program" or "DUI program" means "an alcohol and other drug service which has been issued a valid license by the [Department of Alcohol and Drug Programs] to provide services pursuant to Chapter 9 (commencing with Section 11836.)" (Health & Saf. Code, § 11765, subd. (n).)

Such licensed programs include those authorized to provide alcohol or drug recovery services to, among others, persons convicted of driving under

the influence and who, as part of their sentence, are ordered to be admitted to the program. (Health & Saf. Code, § 11836, subd. (a)(1).) There is no doubt the records sought by the prosecution were held by just such a program. The disclosure of records held by these programs is subject to the requirements of 42 Code of Federal Regulations parts 2.1 through 2.67(1) (2002), as required by title 9, section 9866, of the California Code of Regulations.

Defendant argues Health and Safety Code section 11977 is broad enough to include DUI programs. The statute's language, however, is not clear on that point. ■ We are obligated to "construe a statute in the context of the entire statutory system of which it is a part, in order to achieve harmony among the parts." (*People v. Shirokow* (1980) 26 Cal.3d 301, 307 [162 Cal.Rptr. 30, 605 P.2d 859].) ■ Looking at the statutory system of which Health and Safety Code section 11977 is a part, we discern a legislative intent to treat drug abuse programs and DUI programs separately. Each are defined and regulated in separate parts of division 10.5 of the Health and Safety Code. Construing the statute otherwise would bring disharmony to the entire scheme.

Moreover, to the extent both Health and Safety Code sections 11977 and 11836 could be viewed as applying conflicting provisions to DUI programs, the terms of the more specific statute take precedence over those of the more general statute. (*Craddock v. Kmart Corp.* (2001) 89 Cal.App.4th 1300, 1310 [107 Cal.Rptr.2d 881].) It is obvious section 11836 specifically applies to the DUI program in which defendant was admitted, and section 11977 does not. The trial court correctly determined Health and Safety Code section 11977 did not apply to defendant's DUI program records.

### 2. Trial court did not err by refusing to exclude the records and concurrent testimony due to the prosecution's failure to comply with the federal regulations

Assuming parts 2.1 through 2.67 of 42 Code of Federal Regulations apply, defendant asserts the prosecution failed to comply with these regulations. Specifically, the regulations require a party seeking confidential records to use a fictitious name such as John Doe to refer to the patient. The application for the records may not contain or disclose patient-identifying information unless the court has ordered the record of the proceeding sealed from public review. (42 C.F.R. § 2.65(a) (2002).) Here, the court had not ordered the proceedings sealed when the prosecution applied for its subpoena duces tecum and, in that request, specifically identified defendant by his full name.

Defendant claims the prosecution could not remedy that violation after receiving and reviewing the documents by making its subsequent application

for the records in the name of "John Doe." He argues the trial court erred by not excluding the records and witness testimony from evidence. We disagree.

"The exclusion of relevant evidence . . . is barred by the California Constitution's Right to Truth in Evidence provision, unless otherwise compelled by the federal Constitution. (Cal. Const., art. I, § 28, subd. (d).)" (*People v. Williams* (2002) 28 Cal.4th 408, 415 [121 Cal.Rptr.2d 854, 49 P.3d 203].) The defendant has cited no authority holding the federal Constitution requires exclusion of confidential records obtained without using a fictitious name as may be required by federal regulations. In fact, the federal regulations do not require the records be excluded from evidence due to the failure of either the holder of the records or the person seeking the records to comply with the terms of the regulations. Instead, the regulations specifically provide for the imposition of criminal fines as the remedy to address their violation. (42 C.F.R. § 2.4 (2002).)[6]

Since the relevant evidence was not required to be excluded pursuant to the federal supremacy clause, the California Constitution required it to be admitted. (Cal. Const., art. I, § 28, subd. (d).) The trial court did not err in refusing to exclude the records and the testimony concerning them.

### III-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

We remand the matter to the trial court solely for the purpose of conducting a restitution hearing pursuant to Penal Code section 1202.4. In all other respects, the judgment is affirmed.

Hull, J., and Robie, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 20, 2003. Baxter, J., did not participate therein.

---

[6]The applicable regulation reads in part: "[A]ny person who violates any provision of . . . these regulations shall be fined not more than $500 in the case of a first offense, and not more than $5,000 in the case of each subsequent offense." (42 C.F.R. § 2.4 (2002).)

*See footnote, *ante*, page 437.