Filed 9/18/15  P. v. Barragan-Sullivan CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY BARRAGAN-SULLIVAN,<br><br>      Defendant and Appellant. | A141366<br><br>(Solano County<br>Super. Ct. No. FCR300315) |

**INTRODUCTION**

On February 11, 2013, defendant crashed his car into a utility pole.  His three passengers were injured.  A jury convicted defendant of driving with a blood-alcohol level of 0.08 percent and causing injury.  The jury also convicted defendant of driving on a suspended license.

Breath tests administered at the police station about an hour after the accident showed defendant's blood-alcohol content to be 0.08/0.09 and 0.08/0.08.  The trial court refused to allow the defense to present evidence at trial to show that a preliminary alcohol screening (PAS) test administered at the scene of the accident yielded a blood alcohol level of 0.07.  Defendant argues the court's ruling was prejudicial error under *People v. Williams* (2002) 28 Cal.4th 408, and that his conviction for driving on a suspended license is not supported by substantial evidence.  We agree with the latter contention.  We affirm defendant's conviction for driving with a blood-alcohol level of 0.08 and causing injury.

## STATEMENT OF THE CASE

Defendant Anthony Barragan-Sullivan was charged by information with driving under the influence of alcohol and proximately causing injury to L.V., K.D., and J.K. (count 1), driving with a blood-alcohol level of 0.08 percent and proximately causing injury to L.V., K.D., and J.K. (count 2), and misdemeanor driving with a suspended license (count 3). (Veh. Code, §§ 23153, subds. (a) & (b), 14601.1, subd. (a).)[1] The information also alleged that defendant personally inflicted great bodily injury on L.V. and K.D. in connection with counts 1 and 2. The jury was unable to reach a verdict on count 1, driving under the influence of alcohol and causing injury. It found defendant guilty of count 2 (driving with a blood-alcohol content of 0.08 percent and causing injury), but found the great bodily injury allegation not true. The jury also convicted defendant of driving on a suspended license.

Following the mistrial, count 1 was dismissed on the prosecutor's motion. At sentencing, the court suspended imposition of sentence and granted defendant three years' probation.

## STATEMENT OF FACTS

Defendant was driving a red Toyota involved in a collision with a utility pole on February 11, 2013, at the intersection of Dobbins and Deodara Streets in Vacaville. He had three passengers in the car: J.K., K.D., and L.V.

L.V. was in the back seat behind the passenger seat. She lost consciousness after the accident and was hospitalized for two weeks. L.V.'s injuries included multiple facial fractures, a fractured jaw, multiple rib fractures, and a torn liver. She was in a wheelchair for two months after the accident. Her mouth was wired shut for two and a half months. She admitted to drinking before the accident with several friends; others were smoking pot.

---

[1] Unless otherwise indicated, all statutory references are to the Vehicle Code.

J.K. was seated in the front passenger seat in front of L.V. Defendant was driving before the accident. Before the accident, she and defendant were hanging out with friends. She recalled defendant had one drink of Sailor Jerry's rum from a bottle. She was also drinking that night. Defendant was speeding, the car started to fishtail, then it hit a curb and a telephone pole. J.K. suffered bruises and abrasions from the seat belt and the air bag. She ran from the wreckage.

K.D. was seated behind defendant in the back seat. K.D. sustained back and chin pain. K.D., a diabetic, was feeling dizzy and defendant offered to drive her to the store to get something to correct her low blood sugar. She had no alcohol that day. Before the accident, defendant was driving fast, and someone asked him to slow down.

Trauma surgeon Chris Bandy treated K.D. and L.V. K.D. sustained lacerations to the face and chin, but no significant injuries. K.D. was also treated for diabetic ketoacidosis. L.V. was treated for the multiple injuries noted above.

Vacaville police officer Robert Horel arrived at the collision scene at 11:05 p.m. The speed limit on the roadway was 35 miles per hour. The car had struck a utility pole. Defendant admitted he was travelling southbound on Dobbins when he lost control of the car at an "S" turn and slid into the pole. He said his license was suspended. He admitted he drank two shots of Sailor Jerry's rum approximately 60 to 90 minutes before the accident. They were "pretty big." He believed he drove 40 to 45 miles per hour on the roadway. Defendant had "red and watery" eyes, "slow and slurred" speech, and a moderate smell of alcohol. Defendant said he ate two slices of pizza and a salad that night. Horel gave defendant a PAS test at the scene and a breath test at the station at 12:03 a.m. It showed a reading of .08. The second test was given at 12:05 a.m. and had the same reading.

Solano County toxicologist Nathaniel Overlid testified as an expert in alcohol and its effects on the body. A person with a blood-alcohol level of .08 would be significantly impaired. He checked the records of the Alco Test 710 on the Drager instrument used in

3

this case and found it in proper working order on February 12, 2013, a few minutes after midnight.

Overlid opined a male the size of defendant with a reading of .08, 30 minutes after the collision, who had his last drink 30 minutes before the collision, would have a blood-alcohol level between .074 and .095 at the time of driving.

The parties stipulated defendant placed a 911 call after the collision, and a recording of the call was played for the jury.

## DISCUSSION

### *The Trial Court Properly Excluded Evidence of Defendant's PAS Test Result.*

At trial, Vacaville police officer Robert Horel testified he gave defendant a PAS test. When defense counsel asked whether the PAS test result was .07, the prosecutor interposed a lack of foundation objection, which the trial court sustained. In a sidebar discussion, the court ruled the evidence inadmissible. At a later Evidence Code section 402 hearing outside the jury's presence, the defense called Officer Horel to lay a foundation for admission of the test result. At the conclusion of his testimony, the court confirmed its ruling of inadmissibility, citing the lack of showing on the test's reliability. Defendant argues exclusion of the PAS test result violated his due process right to present a defense and the error was prejudicial under any standard (*People v. Wright* (2006) 40 Cal.4th 81, 98.) We disagree.

Officer Horel testified before the jury that he had been a police officer for 20 years, 17 of those years with the Vacaville Police Department. He had been assigned to a patrol night shift since 2008. At the hearing, Officer Horel testified that prior to administering a PAS to defendant, he had been trained in administering the test. "They showed me the machine, showed me how to turn it on, how to make sure that any previous alcohol had been cleared out and how to take a sample."

Asked if had also been trained to know "if an error is coming out," the officer testified the answer was "complicated." "There are times where the machine shows an

4

error. I've also seen times when the machine is greatly in error compared to later results. I've seen machines show zero for no reason other than we believe it was too cold outside . . . . [P]art of what they taught me is that sometimes the machine will error, and we need to warm it up on the hood of the car or whatever."

However, when Officer Horel administered the test to defendant, he did not get an error message. When he received the result, he did not think it was an error. "I thought it was within the limits of the machine . . . ." Nothing about how the machine was working that day called its use into question. The result was .077.

On cross-examination by the prosecutor, Officer Horel testified his training had occurred several years earlier and "[t]o be clear, it was a couple of minutes of training."[2] He had received no training on how to calibrate the machine. He knew that calibration "is to make sure the internal workings of the machine are accurate against a standard," but he did not know "how or the specifics of how that machine is calibrated." He had never calibrated any PAS device. He did not know if the machine he used on February 11 was calibrated prior to his use of it.

On redirect by the defense, Officer Horel testified he had used a PAS device "dozens" of times, "if not into triple digits." Asked by the court if he knew if the PAS machines were regularly calibrated, the officer answered, "Yes, your Honor." Somebody in the traffic section of his department did the calibrations, but he did not know when the last calibration occurred. "The PAS machines are issued to sergeants and some individual officers. It's their responsibility to turn them in and get them calibrated. I

_____

[2]  By contrast, Officer Horel testified at trial that he had been trained at his original police department and in his field training at the Vacaville Police Department on how to conduct DUI investigations, including using preliminary screening tests instead of field coordination tests when someone has been involved in a crash. He had used a breath machine, called an Alco Drager, at the police station approximately 90 percent of the times he had done a DUI investigation. He explained in detail how to capture a breath sample using the Drager instrument.

have not been issued one, so I don't know anything about the process of the calibration records or anything."

We review the trial court's ruling for abuse of discretion. (*People v. Williams*, *supra*, 28 Cal.4th at pp. 417–418 [admissibility of PAS test results].) " ' "[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1243.)

For PAS test results to be admissible, there must be a foundational showing of (1) the reliability of the instrument, (2) the proper administration of the test, and (3) the competence of the operator. (*People v. Williams, supra,* 28 Cal.4th at p. 414; *People v. Adams* (1976) 59 Cal.App.3d 559, 567.) To meet these requirements, the proponent of the evidence may either show strict compliance with the calibration requirements of California Code of Regulations, title 17, section 1221 et seq., or that the personnel involved in the test were qualified to administer it; the equipment used was in proper working order; and the test was properly administered. (*People v. Adams,* at pp. 561, 567.) "Noncompliance with the Administrative Code regulations goes only to the weight of the blood alcohol concentration evidence," not its admissibility. (*People v. Adams*, at p. 567; *People v. Williams,* at p. 414.)

Defendant argues Officer Horel's testimony met these foundational requirements. While we agree his testimony established his qualifications to administer the test, and that he properly administered it, we cannot say the trial court abused its discretion in determining the reliability of the instrument was not established by his testimony.

Comparison with the type of testimony found acceptable in other cases confirms the foundation for reliability was lacking here. Thus, for example, in *People v. Adams,* "[t]he expert witness testified that the machine was in good working order, and that he had ascertained its reliability by running standard known samples through it prior to giving each actual test. He stated that this served essentially the same function as the

testing of unknown samples called for by the regulation; indeed, he stated that he normally made up the unknown samples used in the laboratory, and that their purpose was to prevent "fudging" of test results." (*People v. Adams, supra,* 59 Cal.App.3d at p. 567.)

In *People v. Williams, supra*, 28 Cal.4th 408, "[t]he accuracy of the Alco Sensor IV used to screen defendant was verified by periodic testing with a standard .10 percent alcohol solution. The device was deemed accurate if the test solution produced a reading ranging from .09 to .11 percent; if not, it had to be recalibrated. The machine's first calibration, on January 28, 1997, produced a .11 percent reading. Although within the permissible range, the machine was recalibrated to record an accurate .10 percent result. All 19 tests conducted between January 1997 and February 1998 produced readings within the accepted range of .09 to .11 percent. The eight calibrations immediately prior to defendant's test, including the last test on November 17, 1997, produced readings slightly below .10 percent." (*Id.* at p. 412; see *People v. Bury* (1996) 41 Cal.App.4th, 1194, 1200 ["the prosecution introduced undisputed expert testimony on the reliability of the Alco-Sensor machines used in Ventura County."].)

Here, by contrast, Officer Horel's testimony fell far short of the showings made above. He testified he knew what calibration was, but had received no training on how to calibrate the device, and had never calibrated any PAS device. More importantly, he did not know if the device he used on February 11 was calibrated prior to his use of it. He did know the PAS devices were regularly calibrated, but he did not know when the last calibration had occurred. "The PAS machines are issued to sergeants and some individual officers. It's their responsibility to turn them in and get them calibrated. I have not been issued one, so I don't know anything about the process of the calibration records or anything." In light of this testimony, the fact he did not receive an error message, and the closeness of the PAS result (.077) to the later breathalyzer result (.08),

did not preclude the trial court from finding that reliability of the PAS had not been sufficiently established.  No abuse of discretion appears.

### *The Evidence Adduced at Trial Was Insufficient to Support a Section 14601.1 Conviction.*

Defendant argues his conviction for a violation of section 14601.1 must be reversed because no evidence was presented to the jury to prove one of the elements of the offense:  the reason for the suspension.  Defendant is correct.  The trial court excluded People's cxhibit No. 5, the Department of Motor Vehicles printout regarding defendant's suspended license, as a sanction for the prosecutor's failure to comply with repeated court orders regarding discovery of defendant's driving history.  When defense counsel later moved pursuant to Penal Code section 1118.1 for acquittal of the charge because the prosecutor had failed to prove the basis for the license suspension, the court denied the motion.  The court stated it did not believe the reason for the violation is actually an element of the offense, but rather a basis for punishment.  The court agreed there was no evidence of the specific reason for the suspension.  The court's solution was to "allow this to go to the jury with simply the elements that the defendant drove a motor vehicle while his driving privileges were suspended or revoked and that when he drove, he knew that his driving privileges were suspended or revoked."

It is axiomatic the People must prove beyond a reasonable doubt every element of the charged offense.  (*In re Winship* (1970) 397 U.S. 358, 364.)  A conviction on anything less is a violation of due process.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 313–314.)  The Attorney General argues defendant has not shown the reason for the suspension is an element of the offense.  We disagree.

Section 14601.1, subdivision (a) provides:  "No person shall drive a motor vehicle when his or her driving privilege is suspended or revoked for any reason other than those listed in Section 14601, 14601.2, or 14601.5, if the person so driving has knowledge of the suspension or revocation.  Knowledge shall be conclusively presumed if mailed

8

notice has been given by the department to the person pursuant to Section 13106. The presumption established by this subdivision is a presumption affecting the burden of proof." "Driving a motor vehicle with a suspended or revoked license, or in violation of the provisions of a restricted license, is prohibited by several sections of the Vehicle Code, which are classified according to the reason for the suspension, revocation, or restriction . . . ." (2 Witkin & Epstein, California Criminal Law (4th ed. 2012), Crimes Against Public Peace and Welfare, § 306, p. 1050.)

The reason for the suspension is an integral part of the statutory language for each type of violation. Thus, under section 14601, a person may not drive a motor vehicle when his or her driving privilege is suspended or revoked for reckless driving, or negligent or incompetent operation of a motor vehicle. (§ 14601, subd. (a).) Under section 14601.5, the reasons include refusal to submit to a chemical sobriety test. (§ 14601.5, subd. (a).) And, under section 14601.1, the reason for the suspension includes "any reason other than those listed" above or in another section not relevant here. (§ 14601.1, subd. (a).) Thus, to be guilty of any of these three misdemeanor offenses, a defendant must have been driving with a license suspended *for one of the specific reasons* enumerated in each of the three relevant Vehicle Code provisions.

In addition, different penalties apply to each of the three charged offenses, according to the seriousness of reasons for the revocation.[3] (§§ 14601.1, subd. (b); 14601.2, subd. (d); 14601.5, subd. (d).)

---

[3] For example, under section 14601, a first offense is punishable by imprisonment in county jail for five days to six months, and a fine of $300 to $1,000. (§ 14601, subd. (b)(1).)

Under section 14601.2, a first offense is punishable by imprisonment in county jail for 10 days to six months and a fine of $300 to $1,000. (§ 14601.2, subd. (d)(1).)

Under section 14601.5, a first offense is punishable by imprisonment in county jail for not more than six months, a fine of $300 to $1,000, or both. (§ 14601.5, subd. (d)(1).)

9

Finally, we note that CALCRIM No. 2220 treats the reason for the suspension as an element to be found by the jury, and includes the reason for the suspension as a sub-element of the first element of the offense.[4] CALJIC No. 16.640 is the same.[5] Some *valid* reason for the suspension is an element of each of the discrete offenses of driving on a suspended or revoked license. Otherwise, driving on an unlawfully or inadvertently

And, under section 14601.1, a first offense is punishable by imprisonment in county jail for not more than six months, a fine of $300 to $1,000, or both. (§ 14601.1, subd. (b)(1).) (2 Witkin & Epstein, California Criminal Law, *supra*, § 306, p. 1051–1053.) It may also be charged or reduced to an infraction. (Pen. Code, §§ 19.8, 17, subd. (d).)

[4] CALCRIM No. 2220 states in relevant part: "The defendant is charged [in Count __] with driving while (his/her) driving privilege was (suspended/ [or] revoked) [in violation of _____ *<insert appropriate code section[s]>*].

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant drove a motor vehicle while (his/her) driving privilege was (suspended/ [or] revoked) [for _____*<insert basis for suspension or revocation>*];

"AND

"2. When the defendant drove, (he/she) knew that (his/her) driving privilege was (suspended/ [or] revoked)."

[5] CALJIC No. 16.640 provides: "[Defendant is accused [in Count[s]  ] of having violated sections [14601, subdivision (a)] [14601.1, subdivision (a)] [14601.2, subdivision (a)] of the Vehicle Code, a misdemeanor.]

"Every person who drives a motor vehicle at any time when [his] [her] driving privilege is [suspended] [revoked] for (reason) and who has knowledge of the [suspension] [revocation] of this driving privilege is guilty of a violation of Vehicle Code §  , a misdemeanor.

"In order to prove this crime, each of the following elements must be proved:

"1. A person drove a motor vehicle;

"2. The person's driving privilege had been previously [suspended] [revoked] for (reason); and

"3. The person had knowledge that [his] [her] driving privilege had been [suspended] [revoked]."

10

suspended license would also be a crime. For these reasons, we conclude the reason for the suspension is an element of the offense of driving on a suspended license.

Nevertheless, the Attorney General would have us sustain defendant's conviction by applying the "rule of convenience and necessity . . . that, unless it is 'unduly harsh or unfair,' the 'burden of proving an exonerating fact may be imposed on a defendant if its existence is "peculiarly" within his personal knowledge and proof of its nonexistence by the prosecution would be relatively difficult or inconvenient.' " (*People v. Mower* (2002) 28 Cal.4th 457, 477 (*Mower*).) The rule finds its first expression under California law in *People v. Boo Doo Hong* (1898) 122 Cal. 606, 607–609, which placed the burden on the defendant to prove he had a license to practice medicine. An instruction based on *Boo Doo Hong* was approved, in a medical licensing case, in *People v. Goscinsky* (1921) 52 Cal. App. 62, 64–65. It has subsequently been applied in prosecutions for misdemeanor violations of section 12500 and is a judicially approved feature of CALJIC No. 16.631 and CALCRIM No. 2221, which are given in section 12500 cases. (*In re Shawnn F.* (1995) 34 Cal.App.4th 184, 196–197; *People v. Garcia* (2003) 107 Cal.App.4th 1159, 1164; *People v. Spence* (2005) 125 Cal.App.4th 710, 715–716.) However, it has never been applied in prosecutions under section 14601.1 and is not a feature of either CALCRIM No. 2220 or CALJIC No. 16.640, which are used in section 14601.1 prosecutions. At least one appellate court has recognized the nonapplicability of the rule of convenience in section 14601 prosecutions as opposed to prosecutions under section 12500, where the rule is acknowledged. (*People v. Spence,* at pp. 714–715.)

Tellingly, the California Supreme Court refused to apply the rule of convenience and necessity in *People v. Montalvo* (1971) 4 Cal.3d 328 in a prosecution under Health and Safety Code section 11502 (furnishing a narcotic to a minor by an adult) to the allegation that the defendant was over the age of 21. "The allegation that the defendant is 21 years of age or over is not a negative averment. A true negative averment, for example that the defendant lacked a prescription for a drug, the possession of which was

11

lawful only on prescription, may often be practically impossible for the prosecution to prove but easy for the defendant to refute. In the absence of a legislative provision that minority is a defense, we do not believe that the relative ability of the prosecution and defense to establish the defendant's age is sufficient to justify invoking the rule of necessity and convenience to relieve the prosecution of its burden of proving the defendant's majority under [Welfare and Institutions Code] section 11502. [¶] The defendant may not necessarily have any substantially greater ability to establish his age than does the prosecution. A defendant's precise age is not a matter within his personal knowledge but something he must have learned either from family sources or public or church records. In this age of documented existence there is little doubt that ordinarily the prosecution may be able to secure evidence of the defendant's age. Moreover, in those rare cases where there is no evidence of the defendant's precise age except his own belief as to what it is, the defendant might be as hard pressed as the prosecution to verify it. If minority be deemed a defense, a defendant in such a case would be at the mercy of the jury's power to disbelieve his testimony even though it be the only available evidence of age. We conclude that a case for the application of the rule of necessity and convenience here has not been made out." (*People v. Montalvo*, at pp. 334–335.)

We note our Supreme Court applied the rule of necessity in *Mower, supra,* 28 Cal.4th 457, in a prosecution for possession and cultivation of marijuana (Health & Saf. Code, §§ 11357, 11358) to a statutory *defense* for patients and caregivers who possess or cultivate marijuana for personal health reasons under Health and Safety Code section 11362.5, the Compassionate Use Act of 1996. (*Mower*, at pp. 463–464.)

Under section 14601.1, the reason for a suspension is an element of the offense, not a defense to it. The defendant may be charged with a rebuttable presumption that he had knowledge of his suspension if it is proved the notice of suspension was mailed to him, but the *reason* for his suspension is not a fact uniquely known to him. Indeed, as the facts here demonstrate, the defendant's driving history is more easily accessed by the

12

prosecution, which then has a duty to discover the information to the defense. Here, no proof was adduced at trial about the reason for the suspension, and defendant did not admit or concede that fact. We therefore find the evidence was insufficient to support defendant's conviction for a violation of section 14601.1.

## DISPOSITION

Defendant's conviction for violation of Vehicle Code section 14601.1 is reversed for insufficient evidence. In all other respects, the judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
BANKE, J.

14

A141366