Filed 4/6/16  P. v. Mahjoob  CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>QAYS MAHJOOB,<br><br>    Defendant and Appellant. | B259878<br><br>(Los Angeles County<br>Super. Ct. No. KA102058) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Affirmed.

Hutton & Wilson and Richard A. Hutton; Jonathan K. Golden, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Qays Mahjoob appeals from his judgment of conviction on two felony counts of driving under the influence of alcohol in violation of Vehicle Code section 23153. The People's case included the result of a blood test taken at the hospital where defendant was treated for injuries sustained in a traffic accident, which test indicated defendant's blood alcohol concentration was 0.22 percent. Defendant attempted to exclude the blood test result, contending the hospital failed to comply with certain regulations applicable to forensic laboratories. The court refused to exclude the blood test result, based mainly upon its finding that regulations relating to forensic laboratories do not apply to clinical laboratories, such as the laboratory maintained by the hospital. Defendant claims the court abused its discretion by excluding the forensic laboratory regulations, and further erred by refusing to give several jury instructions proposed by defendant relating to the regulations. Finding no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### A.     The Accident

On April 4, 2013, Geraldine B. and her eight-year-old daughter Grace spent the day at Disneyland. Geraldine and Grace returned to their car, a 2000 Toyota Camry, and left Anaheim around midnight. An hour later, at roughly 1 a.m. on April 5, 2013, Geraldine was stopped at a red light at an intersection near her house. The road she was travelling on had two lanes running in each direction, with a center lane in the middle for turn lanes. Geraldine was waiting to turn left; her car was in the left pocket turn lane on the correct side of the double yellow line. Geraldine saw a car driving toward her on the opposite side of the road in the lane closest to the center of the road. The car had its headlights on. The oncoming car hit Geraldine's car head on, propelling her car out of the turn lane to the side of the road, and causing the driver's side airbag to deploy. Geraldine and Grace both sustained serious injuries as a result of the crash and were taken by paramedics to U.C. Irvine Medical Center. Doctors performed surgery on Geraldine's foot. Grace required immediate abdominal surgery and a subsequent surgery on her back.

2

Defendant also sustained injuries to his head and left hip as a result of the collision.  At the scene, paramedics observed defendant was somewhat confused and smelled of alcohol.  One of the paramedics who treated defendant started an I.V. catheter at the scene and used an alcohol swab on the defendant's skin before inserting the catheter.

Paramedics took defendant to Western Medical Center (the hospital) for treatment, where he was admitted to the trauma unit.  On arrival, the paramedics briefed the surgeon on call regarding defendant's condition.  Consistent with her general practice, the doctor ordered a series of blood tests, including a blood alcohol level.  An emergency room nurse drew defendant's blood.  In accordance with her usual practice, the nurse cleaned defendant's arm using a prep pad containing isopropyl alcohol (70%) and chlorhexidine before inserting the needle for the blood draw.  In accordance with the hospital's usual practice, the blood samples were labeled and tracked in the hospital's computer system.  The laboratory test revealed defendant's blood alcohol concentration was 0.22 percent.

### B.    The Charges

The information contained two felony counts of driving under the influence.  Count one charged defendant with a violation of Vehicle Code section 23153, subdivision (a), driving under the influence of alcohol.  Count two charged defendant with a violation of Vehicle Code section 23153, subdivision (b), driving with a blood alcohol level of 0.08 percent.  As to both counts, the information alleged defendant inflicted great bodily injury on the two victims within the meaning of Penal Code section 12022.7, subdivision (a), rendering both counts serious felonies within the meaning of Penal Code section 1192.7, subdivision (c)(8).  The information further alleged one strike prior (Penal Code, § 667, subds. (b)-(j), § 1170.12) and one serious felony prior (Penal Code, § 667, subd. (a)(1)).

### C. Defendant's Motion in Limine to Exclude the Hospital's Blood Alcohol Test Result

Prior to trial, defendant moved to exclude the blood alcohol test result on the ground the hospital laboratory did not comply with regulations applicable to forensic laboratories (Cal. Code Regs., tit. 17, § 1215 et seq. ["Group 8 regulations"]). Defendant acknowledged hospital laboratories are not required to follow Group 8 regulations, but argued blood alcohol analysis performed for medical purposes is unreliable—and therefore inadmissible in a criminal proceeding—to the extent it does not comply substantially with those regulations.[1] More particularly, defendant complained the hospital's blood alcohol analysis method, which uses plasma rather than whole blood, is not generally accepted in the community of forensic scientists.

At the hearing on the motion conducted under Evidence Code section 402, the parties stipulated to several foundational facts, including: the hospital is not a forensic laboratory licensed under Group 8 regulations; the hospital did not retain defendant's blood sample for one year after collection; the blood alcohol analysis was not performed by a licensed forensic alcohol analyst; the hospital used an enzymatic method of analysis performed on blood plasma to obtain the blood alcohol level; and, the hospital did not run a duplicate test to confirm the blood alcohol level.

Each side presented testimony regarding the reliability and accuracy of the hospital's blood alcohol test result. Defendant offered expert testimony by Dewayne Beckner, a forensic chemist who worked for the Los Angeles County Sheriff's Department for more than 25 years, regarding the Department of Health Services regulations applicable to forensic laboratories, as well as standard blood alcohol testing protocols used in forensic laboratories. Beckner explained forensic laboratories always test a blood sample twice, in order to ensure accurate results.

---

[1] Hospital laboratories are considered clinical laboratories rather than forensic laboratories. The regulations applicable to clinical laboratories ("Group 2 regulations") are found in a different section of Title 17. (See Cal. Code Regs., tit. 17, § 1029.5 et seq.)

Further, forensic laboratories use whole blood, rather than plasma, to test blood alcohol concentration. Beckner explained that when plasma is separated from blood cells and platelets, the alcohol in the blood stays with the plasma, resulting in a higher alcohol concentration in the plasma sample as compared to an equal amount of whole blood. Accordingly, blood alcohol tests performed on plasma generally yield results that are significantly higher than results performed on whole blood. Beckner also indicated the degree of increased alcohol concentration is difficult to predict and can range between 10 and 30 percent; for that reason, Beckner explained, enzymatic analysis is considered unreliable for forensic purposes.

The People presented testimony by clinical laboratory scientist Nancy Wybel-Davis, the administrative director of the hospital's laboratory. She summarized the licenses the hospital maintains as a clinical laboratory as well as some of the quality control and equipment testing procedures the hospital follows to ensure the accuracy of its laboratory test results. Specifically, she explained the hospital's lab is accredited by the College of American Pathologists (CAP), which she indicated has the highest standards for lab proficiency in the country. As part of the accreditation process, CAP sends its member laboratories samples several times a year; the laboratories test the samples and send the results to CAP for evaluation. CAP then issues reports evaluating the participating laboratories concerning the accuracy of their test results. Wybel-Davis reviewed the 2013 CAP report regarding alcohol testing. The hospital received a 100 percent score for each of the three tests it participated in during 2013. Wybel-Davis also noted the mean blood alcohol level for enzymatic testing was very close to the mean blood alcohol level for gas chromatography (the method used by forensic laboratories), which she said indicated the two different test methods were comparable.

On the basis of this evidence, the court denied defendant's motion to exclude the hospital's blood alcohol test result. The court observed the Department of Health Services adopted separate regulatory and licensing schemes for clinical laboratories (Group 2) and forensic laboratories (Group 8). Although the requirements are different,

5

both sets of regulations had "the objective of ascertaining as accurately and carefully as possible the amount of alcohol in a person's blood." The court also noted there was room for disagreement about which scheme was "better suited to achieve correctness." Ultimately, however, the court found "there is no basis to preclude the introduction of the test result[ ] and that, at least up to this point, there appears to be compliance with the mandates required for the licensing of the hospital involved."

### D. The People's Request to Exclude Evidence and Testimony Regarding Forensic Laboratory Regulations

At the outset of the trial proceedings, the People moved to exclude the Group 8 regulations under Evidence Code section 352. The prosecutor expressed concern that defendant would elicit testimony and present other evidence regarding the forensic laboratory regulations as well as the hospital's failure to comply with them. The prosecutor argued that in light of the court's recognition that Group 8 regulations do not apply in the clinical laboratory setting, defendant's anticipated approach would likely confuse and mislead the jury. Defendant maintained the jury was entitled to know about the Group 8 regulations as well as the hospital's failure to comply with them.

The court expressed its concern that allowing evidence regarding the forensic lab regulations would require "the testimony of experts about a law that has no application to the underlying facts," and would also require the People to introduce testimony regarding Group 2 regulations applicable to clinical laboratories such as the hospital's laboratory. Accordingly, the court granted the People's motion, finding evidence regarding the Group 8 regulations would be unduly time consuming, confusing to the jury, and would have no probative value because the regulations did not apply to the hospital.

### E. Trial Testimony Regarding the Hospital's Blood Alcohol Test Result

#### 1. The People's evidence

The People presented testimony by hospital personnel who participated in defendant's care and treatment at the hospital after the accident, as well as the laboratory personnel that performed the analysis of defendant's blood. As relevant here,

the trauma surgeon ordered a panel of blood tests, including a blood alcohol level, upon defendant's admission to the hospital.  A registered nurse drew a blood sample from defendant in the emergency room.  In the hospital's laboratory, a phlebotomist placed a vial of defendant's blood in a centrifuge and separated the blood cells and platelets from the plasma.  A clinical laboratory scientist then placed the vial of separated blood into a machine called a Dimension RxL (RxL) which measured the amount of alcohol in defendant's blood plasma using an enzyme-based testing process.  According to the hospital's records, the RxL measured defendant's blood alcohol level at 215 milligrams per deciliter.  Rounded and converted to a percentage, the test showed defendant's blood alcohol concentration was 0.22 percent.  In accordance with the hospital's usual practice, defendant's blood samples were destroyed after one week.

The hospital's laboratory administrator, Nancy Wybel-Davis, also testified at trial as she had during the hearing on defendant's motion in limine.  Wybel-Davis again explained the licensure and accreditation requirements for clinical laboratories, and described the hospital's participation in the semi-annual quality control program monitored by CAP.  In addition, Wybel-Davis described the more frequent quality control procedures used by the hospital to ensure the reliability of the RxL machines.  Specifically, she explained that on a daily basis, the hospital laboratory scientists test samples provided by an independent monitoring company, and then the hospital sends its test results to the company for analysis.  As in the CAP program, the independent company compares the hospital's test results with the results of other laboratories participating in the program.  On the day the hospital treated defendant, the RxL used to test his blood for alcohol content scored within the accepted range.

On cross-examination, Wybel-Davis acknowledged the quality control testing done in the hospital laboratory is performed on a clear sample, rather than on human blood.  She confirmed the hospital maintains a clinical laboratory, not forensic laboratory, and as such, the hospital is not required to follow Group 8 regulations.  Further, she explained that the hospital laboratory uses an enzyme testing method to determine blood alcohol concentration, rather than the gas chromatograph method used

7

by forensic laboratories. Finally, she confirmed the hospital laboratory tests a patient's blood solely for medical purposes.

In addition, the People presented an expert witness, Vina Spiehler, a forensic pharmacologist who is board certified in forensic toxicology. Spiehler offered several significant opinions in this case. First, she explained that the machine used by the hospital to measure blood alcohol (Dimension RxL) is very accurate in measuring blood alcohol content and compares well to other methods used to measure blood alcohol. Spiehler indicated that the RxL adds an enzyme to a sample of blood plasma to determine the amount of alcohol present in the blood. Specifically, the machine measures the amount of light that can shine through a plasma sample. Then, it adds an enzyme which reacts with and binds to any alcohol in the sample. After allowing the enzyme time to react, the machine shines a light through the sample a second time. The decrease in light penetration is used by the machine to calculate the alcohol level in the sample. As compared to gas chromatography, the preferred method in forensic laboratories, Spiehler said the RxL has a correlation of 0.989, which she described as "a good correlation."

Second, Spiehler acknowledged alcohol levels in plasma are typically 15 to 20 percent higher than the levels found in whole blood because all the alcohol in a blood sample stays with the plasma as the blood is separated in a centrifuge. In order to convert the result obtained from a plasma sample into a whole blood equivalent, Speihler generally divides the result by 1.18, a number derived from scientific studies. According to Speihler, although the raw data indicated defendant's blood plasma alcohol level was 0.22 percent, in her opinion his whole blood alcohol level was most likely 0.19 percent, but could have been anywhere in the range of 0.16 to 0.21 percent. On cross-examination, Spiehler conceded defendant's blood alcohol level could have been slightly lower, in the range of 0.159 to 0.195 percent.

Third, Speihler explained that the RxL measures ethanol, the type of alcohol found in alcoholic beverages such as wine, beer and spirits. By design, the machine does not register other types of alcohol, such as isopropyl alcohol, which is rubbing

alcohol. Accordingly, the RxL's blood alcohol test results would not be impacted by alcohol used topically, and as part of a normal clinical procedure.

Finally, Spiehler commented on the differences between forensic laboratory practices and clinical laboratory practices. For nearly seven years, Spiehler worked for the Orange County Crime Lab and investigated deaths caused by drunk driving. She explained that forensic laboratories take a different approach to blood alcohol testing in that they analyze whole blood, they generally run more than one test to determine the alcohol level in a sample, and they retain samples for at least one year to allow law enforcement and/or a defendant to perform additional tests on the sample. Spiehler indicated the forensic laboratory approach is probably the best practice, and that it would also be best practice to confirm a blood alcohol level obtained by enzymatic testing by performing a second test using a different method of analysis. She also conceded that when a laboratory only runs one test on a sample, she would have "perhaps not as high a level of confidence in the result as you'd have if you did more on it."

### 2. Defendant's evidence

Defendant again presented testimony by Dewayne Beckner, an expert forensic chemist. As he did at the hearing on defendant's motion in limine, Beckner highlighted the differences between forensic and clinical laboratory procedures. In Beckner's opinion, the enzymatic method used by the hospital is not used in any crime lab in California because "it's not forensically reliable." Beckner further criticized the hospital on several grounds. First, he stated daily machine testing would be inadequate in the forensic setting, where machines are tested before, during and after every test. Second, he criticized the methodology used by CAP because it evaluates laboratories on their accuracy in comparison to other laboratories performing the same test, whereas forensic laboratories measure their performance against an absolute standard. Further, based upon his review of the CAP 2013 alcohol test results, he stated although CAP deemed the hospital's results to be "acceptable," the hospital's test results were not

within five percent of the mean. In his view, that level of variation would not be acceptable in the forensic laboratory setting.

Beckner also explained several differences between the enzymatic testing method used by the hospital and the gas chromatography method used by forensic laboratories. In his view, the hospital's method is susceptible to contamination through the topical use of alcohol to clean a patient's skin immediately before inserting a needle to collect a blood sample. Further, the size of test sample used by the RxL is too small to get a forensically reliable result. Beckner also challenged the hospital's practice of destroying a blood sample after one week. In his opinion, the better practice, and the one used by forensic laboratories, is to maintain a sample for at least one year so it can be retested. For all those reasons, Beckner stated he had "no forensic confidence at all" in the hospital's blood alcohol test result.

### F. Verdict and Sentencing

The jury found defendant guilty on both counts and found the allegations regarding serious bodily injury true as to both victims. Prior to sentencing, defendant brought a *Romero* motion seeking to strike his prior serious felony conviction. The court denied the motion and imposed the sentence as follows. On count one, the court selected the mid-term base sentence of two years, which it doubled due to the prior felony conviction (Pen. Code, § 1170.12, subd. (c)(1)), resulting in a base term of four years. The court imposed two three-year enhancements due to the serious bodily injury of the victims (Pen. Code, § 12022.7, subd. (a)) and an additional five year enhancement due to the prior serious felony conviction (Pen. Code, § 667, subd. (a)(1)), all to run consecutively for a total sentence of 15 years imprisonment in state prison. The court stayed the conviction and related enhancements on count two under Penal Code section 654. The court ordered a restitution fine of $300 (Pen. Code, § 1202.4, subd. (b)) and restitution to the victims in an amount to be determined (Pen. Code, § 1202.4, subd. (f)). The court also awarded a total custody credit of 183 days, comprised of 159 days of actual custody and 24 days of good time credit.

# CONTENTS

Defendant contends the trial court erred by excluding Group 8 regulations under Evidence Code section 352, refusing to give defendant's proposed pinpoint instruction relating to Group 8 regulations, and refusing to instruct the jury it could consider the hospital's noncompliance with Group 8 regulations in evaluating the blood test result.

# DISCUSSION

## A. The Trial Court Did Not Abuse Its Discretion By Excluding Inapplicable Regulations Under Evidence Code § 352.

Defendant contends the court erroneously excluded under Evidence Code section 352 evidence and testimony regarding Group 8 regulations applicable to forensic laboratories.  We disagree.

" ' "It is within a trial court's discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.  (Evid. Code, § 352.)  Our review on this issue is deferential.  A trial court's decision whether to exclude evidence pursuant to Evidence Code section 352 is reviewed for abuse of discretion." ' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 457.)  Here, the court found the Group 8 regulations applicable to forensic laboratories had no probative value because they did not apply to the hospital, which maintained a clinical laboratory.  The court was correct.  Under Health and Safety Code section 100700, "laboratories engaged in the performance of forensic alcohol analysis tests by or for law enforcement agencies on blood, urine, tissue, or breath for the purposes of determining the concentration of ethyl alcohol in persons involved in traffic accidents or in traffic violations shall comply with Group 8 (commencing with Section 1215) of Subchapter 1 of Chapter 2 of Division 1 of Title 17 of the California Code of Regulations . . . ." (Health & Saf. Code, § 100700, subd. (a)(1).)  It is undisputed the hospital is not a forensic laboratory; it is a clinical laboratory and as such it is subject to the regulations set forth in Group 2 (commencing with section 1029.5) of the same section of Title 17.

The court also concluded if it allowed defendant to present evidence and testimony regarding the inapplicable regulations, two results were likely. First, the People would be required to present evidence and testimony regarding the applicable Group 2 regulations, which would render the entire subject unduly time consuming. Second, it was likely the jury would be misled or confused if defendant presented evidence about Group 8 regulations applicable to forensic laboratories and then the court instructed the jury that those regulations do not apply to clinical laboratories, such as the laboratory maintained by the hospital. Accordingly, the court excluded the Group 8 regulations as irrelevant. We see no error in the court's reasoning. (See *People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1689-1690 [approving trial court's decision to exclude under Evidence Code § 352 evidence of statutes and regulations from other states regarding Christian Science health practices due to lack of probative value, undue consumption of time, and potential to mislead and confuse the jury].)

Defendant argues the court's ruling was extremely prejudicial because it prevented him "from presenting the core of his defense, *i.e.*, that the hospital's protocols fell far short of the stricter procedures applied statewide to all forensic alcohol laboratories and, in turn, the reliability of the hospital's lab result was subject to doubt." In so arguing, defendant overstates the scope and impact of the court's ruling. Although the court excluded testimony and references to Group 8 regulations, it did not prevent the defendant from exploring the broader issue—the different standards of practice used by clinical laboratories and forensic laboratories. Indeed, defendant challenged the reliability of the hospital's blood test result on that basis throughout the trial.

In opening statements, for example, defense counsel focused on the higher level of alcohol found in plasma as compared to whole blood: "[T]hey didn't analyze whole blood. What they did was they centrifuge it out. It goes around real fast, and red blood cells settle to the bottom of the vial and there's liquid at the top. There's always going to be more alcohol in the liquid in the top of the sample." He then criticized the hospital's use of enzyme-based testing, which he argued is not as precise as gas chromatography: "Here the People are going to use a number. They don't know what

12

the number is. They can just give you a range of what their expert thinks it must have been because they never analyzed whole blood." Then during trial, as described in detail *ante*, defense counsel elicited testimony from hospital employees regarding their practices related to the blood draw and testing, including the topical use of isopropyl alcohol in defendant's skin prior to the blood draw. Defense counsel also questioned the People's expert, Vina Spiehler, regarding the practices used by forensic laboratories as compared to the practices used in clinical laboratories, eliciting testimony suggesting the best practices in forensic laboratories are more rigorous and more reliable than those used at hospitals. Perhaps most importantly, defendant presented expert testimony criticizing the standards of practice used at the hospital. As summarized *ante*, the defense expert, Beckner, testified that the hospital's blood test results had "no forensic reliability" because the hospital does not follow the standard practices of forensic laboratories.

Finally, defense counsel emphasized the point during closing argument: "So let's talk about the blood for a minute. I throw this out. I think it's self-evident that if you're asking a jury to convict somebody of a serious crime that they should do it right with the people that are analyzing the blood in this case, should do it right." Counsel then reminded the jury the hospital staff applied alcohol topically before drawing the blood and, further, used an enzymatic analysis method which was inaccurate in that it identifies a range rather than a precise blood alcohol level. He went on to criticize the proficiency testing used for accreditation purposes: "[T]he proficiency tests that were mentioned by [the prosecutor] would never pass muster, would never come close to passing muster in a forensic laboratory. They're outside of 5% on three of their five [test results]." Then, in addition to criticizing the hospital for testing defendant's blood sample only once, as opposed to twice as is required in a forensic laboratory, counsel concluded: "My point is this: They're held to much looser standards than a forensic alcohol laboratory is." The record before us demonstrates defendant was allowed to, and did, challenge the hospital's blood test result because it did not comply with the standards of practice used by forensic laboratories. The existence and content of the

13

Group 8 regulations themselves, which was the subject of the court's exclusionary order, would have added little, if any, weight to defendant's argument.

In short, we see no error in the court's decision to exclude evidence relating to the regulations applicable to forensic laboratories under Evidence Code section 352. Assuming the court did err in some fashion, the error was harmless.

**B.      The Trial Court Properly Refused To Give Defendant's Proposed Pinpoint Instruction Regarding Forensic Laboratory Regulations**

Defendant contends the court erred by refusing to give his proposed pinpoint instruction regarding Group 8 regulations. We disagree.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]" (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189; see also Pen. Code, § 1127 ["Either party may present to the court any written charge on the law, but not with respect to matters of fact, and request that it be given. If the court thinks it correct and pertinent, it must be given; if not, it must be refused"].) The propriety of jury instructions is a legal question we review de novo. (*People v. Leeds* (2015) 240 Cal.App.4th 822, 830.)

"Under appropriate circumstances, 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.) Here, the defendant requested a lengthy pinpoint instruction which quoted six of the Group 8 regulations. The instruction would have advised the jury, for example, that Group 8 regulations require collection of enough blood to permit duplicate testing, prohibit topical use of alcohol to clean the skin surface

14

before taking the blood sample, and require blood sample retention for one year. As we explained *ante*, these regulations did not apply to the hospital. Accordingly, the proposed instruction did not state "principles of law governing the case," as required. Further, the requested instruction was plainly argumentative, in that it emphasized defendant's contention the hospital should have been held to the purportedly higher standards of practice applicable to forensic laboratories. For both these reasons, we conclude the court properly refused the pinpoint instruction.

### C. The Trial Court Was Not Required To Give The Optional Language in CALCRIM Instructions Nos. 2100 and 2101 Regarding Title 17 Regulatory Compliance

Finally, defendant contends the court erred by refusing to instruct the jury it could consider the hospital's failure to comply with Group 8 regulations when it considered the hospital's blood alcohol test result. We disagree.

The court properly instructed the jury regarding the elements of the two felony offenses using CALCRIM No. 2100 [driving under the influence] and 2101 [driving with a blood alcohol level of 0.08%]. As given, CALCRIM No. 2100 sets forth four elements the prosecution must prove beyond a reasonable doubt: "(1) The defendant drove a vehicle; (2) When he drove a vehicle, the defendant was under the influence of an alcoholic beverage; (3) While driving a vehicle under the influence, the defendant also committed an illegal act or neglected to perform a legal duty; and (4) The defendant's illegal act or failure to perform a legal duty caused bodily injury to another person." The instruction goes on to provide in pertinent part: "A person is under the influence if, as a result of drinking or consuming an alcoholic beverage, his or her mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances. [¶] . . . [¶] If the People have proved beyond a reasonable doubt that the defendant's blood alcohol level was 0.08 percent or more at the time of the chemical analysis, you may, but are not required to, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense."

15

CALCRIM No. 2101 contains identical language regarding the elements of that offense, except that element 2 is more specific, requiring the prosecution to prove "the defendant's blood alcohol level was 0.08 percent or more by weight." In terms of the standard of proof, CALCRIM No. 2010's language is similar to CALCRIM No. 2100, providing: "If the People have proved beyond a reasonable doubt that a sample of the defendant's blood was taken within three hours of the defendant's driving and that a chemical analysis of the sample showed a blood alcohol level of 0.08 percent or more, you may, but are not required to, conclude that the defendant's blood alcohol level was 0.08 percent or more at the time of the alleged offense."

Defendant does not argue these instructions were incorrect. Instead, he contends the court erred when it refused to give an optional paragraph found in both of the pattern CALCRIM instructions. Specifically, defendant requested the court to instruct the jury: " 'In evaluating any test results in this case, you may consider whether or not the person administering the test or the agency maintaining the testing device followed the regulations of the California Department of Health Services.' " (CALCRIM Nos. 2100, 2101.) Further, and as already noted, defendant requested the court give a special pinpoint instruction containing the text of several Group 8 regulations. Taken together those instructions would have advised the jury it could consider the hospital's failure to comply with Group 8 regulations when it considered the weight of the blood alcohol test result.

In order to evaluate defendant's instructional error claim, we summarize relevant law regarding the regulations applicable to blood alcohol tests conducted by or for law enforcement, and the legal effect of noncompliance with those regulations. The optional language in CALCRIM Nos. 2100 and 2101 was derived from two cases: *People v. Adams* (1976) 59 Cal.App.3d 559, 567 (*Adams*) and *People v. Williams* (2002) 28 Cal.4th 408, 417 (*Williams*). The issue presented in those cases was whether law enforcement's failure to comply with Group 8 regulations governing breath tests rendered the test results inadmissible under Evidence Code section 402.

16

In *Adams*, the defendants asked the court to exclude the results of a breath test which failed to strictly comply with the applicable regulation regarding equipment calibration. In analyzing the issue, the court first noted the prevailing view that breath tests are considered a reliable means to determine blood alcohol concentration, so long as the general foundational requirements for admissibility of testing results are met. (*People v. Adams, supra,* 59 Cal.App.3d at p. 561 [noting admissibility requirements "are that (1) the particular apparatus utilized was in proper working order, (2) the test used was properly administered, and (3) the operator was competent and qualified"].) Further, although the applicable regulations provided " 'the testing of breath samples by or for law enforcement agencies for purposes of determining the concentration of ethyl alcohol in the blood of persons involved in traffic accidents or in traffic violations shall be performed in accordance with' " the regulatory standards, the regulations did not indicate whether or to what extent noncompliant test results would be admissible in criminal proceedings. (*Id.* at p. 562.) The court cited Evidence Code section 351, which "favor[s] admissibility [of evidence] in the absence of a contrary expression in a statute," and ultimately concluded "noncompliance goes merely to the weight of the evidence. The regulations are an expressed standard for competency of the test results; in effect, they are a simplified method of admitting the results into evidence." (*Adams, supra,* at pp. 565, 567.) Although the court indicated the defendants "were entitled to attempt to discredit the results by showing that noncompliance affected their validity," the court rejected the defendants' contention "that such noncompliance inherently and automatically rendered the machine unreliable and the test results worthless," holding that so long as the general indicia of reliability are present, test results obtained by law enforcement without regulatory compliance are admissible. (*Id.* at p. 567.)

The Supreme Court later adopted *Adams*, noting "[e]ssential to *Adams* was the principle that admissibility depends on the reliability and consequent relevance of the evidence, not the precise manner in which it was collected. Compliance with regulations is sufficient to support admission, but not necessary. Noncompliance goes only to the weight of the evidence, not its admissibility. [Citation.]" (*Williams, supra,*

17

28 Cal.4th at p. 414.) The court further clarified that "although the regulations are *a* standard of competency, they are not the *only* standard." (*Id.* at p. 416.) The court held "breath test results are admissible upon a showing of either compliance with title 17 or the foundational elements of (1) properly functioning equipment, (2) a properly administered test, and (3) a qualified operator . . . . " (*Id.* at p. 417.)

*Adams* and *Williams* stand for the proposition that compliance with applicable regulations is a means of establishing the reliability of test results under Evidence Code section 402; failure to comply with applicable regulations may be used at trial to cast doubt on the reliability of the test results. But *Adams* and *Williams* do not hold (and cannot reasonably be read to mean) failure to comply with *inapplicable* regulations indicates test results are not reliable. The court was under no obligation to instruct the jury on that unsound theory.

Defendant also maintains "[t]he trial court would not allow the jurors to consider that lack of compliance [with Group 8 regulations] when deciding the weight to be afforded the test results." First, defendant blurs the distinction between regulations and standards of practice. The court excluded evidence of the regulations only, and did not prevent defendant from exploring the more pertinent issue to his defense, namely the purportedly heightened standards of practice used by forensic laboratories, as compared to the hospital laboratory. As explained *ante*, defendant had ample opportunity to exploit that argument at trial.

Second, and in any event, the instructions made clear the People needed to prove each element of the offense beyond a reasonable doubt and made clear the hospital's test results were not conclusive on the issue of intoxication. On count one, the second element required the People to prove that "when he drove the vehicle, the defendant was under the influence." After describing generally that a person is under the influence if his or her mental abilities were so impaired that he or she could no longer drive a vehicle with the caution of a sober person using reasonable care, the instruction then stated "[i]f the People have proved beyond a reasonable doubt that the defendant's blood alcohol level was 0.08% or more at the time of the chemical analysis, you may,

18

but are not required to, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense." The second charge, driving with a blood alcohol level of 0.08% or above, contained similar language on this point. These instructions advised the jury that it had to find beyond a reasonable doubt defendant was under the influence at the time of the accident, and that the hospital test result was relevant but not conclusive on that point. As the triers of fact, the jurors had the right to reject the test result. Accordingly, the court's refusal to give the optional paragraphs in the pattern instructions did not impermissibly remove the issue of reliability from the jury, as defendant asserts.

Defendant also cites Evidence Code section 403 and seems to suggest the trial court "was required to instruct the jury to determine whether the hospital protocols were reliable and to disregard the test result unless they found the test to be reliable." Although defendant couches his argument as an attack on jury instructions, it appears defendant believes the jury should have been asked to make a specific factual finding regarding the blood test's reliability. But defendant's cited authority, Evidence Code section 403, governs the admissibility of evidence, not special jury findings or jury instructions. "When . . . the relevance of evidence depends on the existence of a preliminary fact, the proffered evidence is inadmissible unless the trial court finds there is sufficient evidence to sustain a finding of the existence of the preliminary fact. (Evid. Code, § 403, subd. (a)(1).) That is, the trial court must determine whether the evidence is sufficient for a trier of fact to reasonably find the existence of the preliminary fact by a preponderance of the evidence. [Citation.] 'The court should exclude the proffered evidence only if the "showing of preliminary facts is too weak to support a favorable determination by the jury." ' [Citation.] A trial court's decision as to whether the foundational evidence is sufficient is reviewed for abuse of discretion. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1120, disapproved on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 114.) As best we can discern, defendant suggests the jury was required to find, as a preliminary fact, that the test was reliable. However, defendant cites no authority suggesting the jury is required to make

19

an explicit factual finding as to reliability, nor has he demonstrated he requested that the jury make such a finding. In the absence of relevant authority or factual support, we reject the defendant's argument. (See, e.g., Cal. Rules of Court, rule 8.204(a); *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1003, fn. 2 [appellant must provide sufficient citations to record; contentions waived when there is a lack of reasoned argument and citation to authority]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

HOGUE, J. [*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.