Filed 11/29/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAVANNAH PHILLIPS,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>STEVE GORDON,<br>DIRECTOR OF<br>DEPARTMENT OF MOTOR<br>VEHICLES,<br><br>     Defendant and<br>Respondent. | A165289<br><br>(San Mateo County<br>Super. Ct. No. 21-CIV-04140) |

Savannah Phillips appeals from the trial court's denial of her petition for review of an order of the Department of Motor Vehicles (DMV or Department) suspending her driver's license for driving with a blood-alcohol concentration (BAC) of 0.08 percent or more. Phillips argues the trial court erred because the DMV failed to provide sufficient foundational evidence of the reliability of the way in which her blood was collected for the BAC test. She contends she rebutted the presumption that the certified phlebotomy technician (CPT) drew her blood in a proper manner by showing that the CPT was not supervised and the procedure she followed was not properly approved as required by applicable regulations and statutes. We agree that Phillips rebutted the presumption of reliability but will affirm the trial

court's order because evidence introduced at the hearing nonetheless established the reliability of the manner of collection of Phillips' blood.

## BACKGROUND

One night in September 2020, around 11:23 p.m., a California Highway Patrol officer pulled Phillips over and arrested her for driving under the influence in violation of Vehicle Code section 23152, subdivision (a). The officer's partner took Phillips to a facility in Burlingame and requested a phlebotomist.

A phlebotomist named Yasmin Ramos, employed by Bay Area Phlebotomy and Laboratory Services, arrived. At 1:07 a.m., Ramos took a needle out of a sealed package supplied by the San Mateo County Forensic Lab, cleaned Phillips' arm with a non-alcoholic antiseptic wipe, and drew two vials of blood from a vein in Phillips' right arm. The officer gave Phillips a notice informing her that the DMV would suspend or revoke her privilege to drive a car within 30 days because of her arrest for driving under the influence.

The county lab measured Phillips' BAC at 0.110 percent, +/- 0.004 percent. The lab report states, "Based on the information provided, the collected sample appears to be compliant with Title 17."[1]

---

[1] This is an apparent reference to title 17, sections 1215 to 1222.1 of the California Code of Regulations, which governs the operation of forensic alcohol laboratories and collection of evidence. (*Davenport v. Department of Motor Vehicles* (1992)

At an administrative hearing in June 2021 concerning the suspension of Phillips' license, the DMV hearing officer offered into evidence the lab test report and the arresting officer's investigation report. Phillips objected to the lab report on the grounds of, among other things, lack of foundation. Phillips asserted her own evidence would rebut the presumption under Evidence Code section 664 that the blood was properly collected and argued the certification on the lab report was therefore insufficient on its own to establish the test's foundational scientific reliability. The hearing officer overruled the objection and admitted the documents into evidence.

Phillips called one witness, Salustiano Ribeiro, the president and chief executive officer of Bay Area Phlebotomy and Laboratory Services (the company). Ribeiro testified that Ramos had been hired in February 2020. Ramos was only a CPT, not a licensed physician and surgeon, registered nurse, licensed vocational nurse, licensed clinical laboratory scientist, licensed clinical laboratory bioanalyst, certified paramedic, or licensed physician assistant.[2] Before Ramos was allowed to draw blood for the company, she had to pass a written competency exam for

_____

6 Cal.App.4th 133, 142 (*Davenport*).) Subsequent citations to title 17 are to the California Code of Regulations.

[2] Phillips elicited this testimony because, as explained *post*, regulations governing the collection of blood for purposes of BAC tests require certain actions to be performed by a "physician and surgeon, physician assistant, clinical laboratory bioanalyst, registered nurse, or clinical laboratory scientist." (Veh. Code, § 23158, subd. (g); see also *id.,* subd. (e); title 17, § 1219.1, subd. (a).) In the interests of brevity, we will refer to anyone meeting one of these criteria as a "qualified" person or supervisor.

the company and a supervisor named Josh Hammack, who was also a CPT, observed her draw blood.

Phillips also used Ribeiro's testimony to establish several violations of governing regulations.[3]  First, a licensed physician and surgeon had not approved the company's policies and procedures that Ramos followed to draw blood.  (Tit. 17, § 1219.1, subd. (a) [requiring compliance with Veh. Code, § 23158]; Veh. Code, § 23158, subd. (e).)  Second, a qualified person had not reviewed and verified Ramos' competency to draw blood for alcohol testing purposes before she was first allowed to draw blood for those purposes without direct supervision.  (Veh. Code, § 23158, subds. (e) & (g).)  Third, a qualified person had not reviewed and verified Ramos' work at least once a month to ensure compliance with policies, procedures, and regulations. (*Ibid.*)  Finally, no qualified individual was accessible for consultation within 30 minutes when Ramos drew Phillips' blood. (*Ibid.*)  We will refer to the first violation as the "approval of procedures violation" and the other violations as the "supervisory violations."[4]

---

[3] Because the DMV does not dispute that Phillips established these violations, we need not describe in detail the evidence showing the violations.

[4] Phillips argues that she also established that a qualified supervisor did not review Ramos' competency on an annual basis. However, Ramos drew Phillips' blood within the first year of her employment, so no annual review was necessary at that time. Any failure to review Ramos' competency after she drew Phillips' blood is irrelevant.

In closing argument, Phillips argued these four violations rebutted the presumption under Evidence Code section 664 that the collection of her blood was properly performed, making the blood test result inadmissible without some foundational evidence of scientific reliability. The hearing officer rejected Phillips' argument because Ramos was a certified phlebotomist and found a preponderance of the evidence supported all of the required elements for suspending Phillips' license. The hearing officer therefore ordered the suspension of Phillips' driving privilege.

Phillips filed in the trial court a petition for review of the DMV's order, renewing her argument about the lack of foundational evidence of the reliability of her blood collection. The trial court denied the petition, concluding that even assuming Phillips had established the violations she alleged, *Gerwig v. Gordon* (2021) 61 Cal.App.5th 59 (*Gerwig*) had already concluded that such violations did not rebut the presumption that the blood test was properly performed.

## DISCUSSION

## I.  Legal background and standard of review

Administrative DMV hearings are informal, are governed by the Administrative Procedure Act, and do not "require the full panoply of the Evidence Code provisions used in criminal and civil trials." (*Petricka v. Department of Motor Vehicles* (2001) 89 Cal.App.4th 1341, 1348 (*Petricka*).) The only issues to be decided at such a hearing are "whether the arresting officer had reasonable cause to believe [the accused] was driving, whether

she was arrested for an enumerated offense, and whether she was driving with 0.08 percent BAC or higher." (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1207–1208.)[5] "If the DMV hearing officer finds these three statutory prerequisites proved by a preponderance of the evidence, the accused's driver's license will be suspended for four months if the driver has had a clean driving record [citation]." (*Id*. at p. 1208.) When a driver submits to a blood test, as Phillips did, at the administrative hearing the DMV typically satisfies its burden of proving the driver had a BAC of 0.08 percent or higher with "two documents: the sworn statement of the arresting officer and a forensic lab report documenting the results of a chemical test of the driver's blood." (*Petricka*, at p. 1348.)

Usually, to establish the necessary foundational requirement of reliability for the admission of test results like a BAC lab report, a party would have to show either compliance with title 17 or provide evidence of the foundational elements of (1) properly functioning equipment, (2) a properly administered test or collection procedures, and (3) a competent and qualified operator. (*People v. Williams* (2002) 28 Cal.4th 408, 417 (*Williams*); *Davenport*, *supra*, 6 Cal.App.4th at pp. 140, 142; *Petricka*, *supra*, 89 Cal.App.4th at p. 1349 [foundation requirement applies to evidence collection].) But because DMV

---

[5] "Somewhat different rules apply to those under 21 years of age [citation], those driving commercial vehicles [citation], and those on probation for prior drunk driving convictions [citation]." (*Coffey v. Shiomoto, supra*, 60 Cal.4th at p. 1208, fn. 9.) None of these other rules is relevant here.

administrative hearings are not criminal trials and the foundational fact of compliance with title 17 is not a part of the DMV's prima facie case, the DMV need not submit evidence of such compliance and may instead rely on the presumption in Evidence Code section 664. (*Petricka,* at pp. 1348, 1350; *Davenport*, at p. 144.)

Evidence Code section 664 states in pertinent part, "It is presumed that official duty has been regularly performed." Under this statute, at an administrative hearing, the forensic laboratory or technician collecting evidence for testing is presumed to have complied with the governing regulations. (See *Imachi v. Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 816–817 & fn. 5 [presumption applies to forensic laboratory as an agent of a public entity].) "If the licensee shows, through cross-examination of the officer or by the introduction of affirmative evidence, that official standards were in any respect not observed, the burden shifts to the Department to prove that the test was reliable despite the violation," through evidence of the three foundational elements. (*Davenport*, *supra*, 6 Cal.App.4th at p. 144.)

"[T]he hearing officer's decision is subject to judicial review. [Citations.] The trial court exercises its independent judgment to determine whether the administrative decision was supported by the weight of the evidence. [Citation.] On appeal, we determine whether substantial evidence supports the trial court's findings. [Citations.] To the extent the question is one of statutory or regulatory interpretation, we exercise our independent

judgment." (*Delgado v. Department of Motor Vehicles* (2020) 50 Cal.App.5th 572, 577.)

## II.    Analysis

As in the DMV hearing and the trial court, Phillips contends that she rebutted the Evidence Code section 664 presumption that Ramos' collection of her blood complied with title 17 by establishing the above-described approval of procedures and supervisory violations.[6]  Although the violations are undisputed, to evaluate their significance it is helpful to briefly review the language of the regulation and statute Phillips showed were violated.

Title 17, section 1219.1, subdivision (a) governs the collection of blood samples and requires them to be "processed in compliance with Vehicle Code Section 23158."  As relevant here, Vehicle Code section 23158, subdivision (a) establishes that only certain individuals, including qualified individuals and CPTs, "acting at the request of a peace officer may withdraw blood for the purpose of determining the alcoholic content therein."

Subdivision (e) states, "Notwithstanding any other provision of law, a person who has been issued a 'certified phlebotomy technician' certificate pursuant to Section 1246 of the Business and Professions Code and who is authorized by this section to draw blood at the request and in the presence of a peace officer for purposes of determining its alcoholic content,

---

[6] Phillips does not challenge the presumption that her blood was properly tested, merely the presumption that it was properly collected.

may do so in a jail, law enforcement facility, or medical facility, with general supervision.  The 'certified phlebotomy technician' shall draw blood following the policies and procedures approved by a [licensed] physician and surgeon . . . appropriate to the location where the blood is being drawn and in accordance with state regulations."  (Veh. Code, § 23158, subd. (e).)

Subdivision (f) requires CPTs (and no one else) to carry a valid identification card with their name, certificate type, and effective dates when performing blood withdrawals.  (Veh. Code, § 23158, subd. (f).)

Subdivision (g) defines "general supervision."  It states, "As used in this section, 'general supervision' means that the supervisor of the technician is licensed under the Business and Professions Code as a [qualified individual] and reviews the competency of the technician before the technician may perform blood withdrawals without direct supervision, and on an annual basis thereafter.  The supervisor is also required to review the work of the technician at least once a month to ensure compliance with venipuncture policies, procedures, and regulations.  The supervisor, or another [qualified] person . . . shall be accessible to the location where the technician is working to provide onsite, telephone, or electronic consultation, within 30 minutes when needed."  (Veh. Code, § 23158, subd. (g).)

Finally, Vehicle Code section 23158, subdivision (h) states, "Nothing in this section shall be construed as requiring the certified phlebotomy technician who is authorized to withdraw blood by this section at the request and in the presence of a peace

officer for purposes of determining alcoholic content to be associated with a clinical laboratory or to be directly supervised after competency has been established."

Phillips argues that because the testimony established violations of Vehicle Code section 23158, subdivisions (e) and (g), she rebutted the Evidence Code section 664 presumption that Ramos' blood collection complied with title 17, and thus for her blood test results to be admissible, the DMV had to submit evidence that (1) the blood collection equipment was properly functioning, (2) the blood was properly collected, and (3) Ramos was competent and qualified. She asserts the DMV failed to do this and concludes that the test result was inadmissible and the remaining evidence does not show she was driving with a BAC above 0.08 percent.

## A. *Rebuttal of the presumption of compliance*

### 1. Gerwig

As the trial court recognized, *Gerwig* considered and rejected a virtually identical argument. At the DMV hearing in that case, the hearing officer found the driver had established supervisory violations like those Phillips established here. (*Gerwig*, *supra*, 61 Cal.App.5th at pp. 63–64.) The hearing officer relied on the lab report anyway because there was no evidence that the phlebotomist was unqualified or that there was a problem with the driver's specific test. (*Id.* at p. 64.) The trial court denied the driver's petition for review on the same rationale. (*Ibid.*)

The Court of Appeal affirmed.  (*Gerwig, supra,* 61 Cal.App.5th at p. 62.)  It recognized that *Davenport* had stated that evidence " 'that official standards were *in any respect* not observed' " would rebut the Evidence Code section 664 presumption that a test was properly performed.  (*Gerwig,* at p. 67, italics added.)  But the court believed the " 'in any respect' " phrase was dicta that was inconsistent with *Davenport*'s reasoning and the cases on which *Davenport* relied.  (*Id.* at pp. 67–68.)  *Gerwig* viewed those cases, as well as others concerning title 17 violations at DMV hearings, as focusing on whether a driver proved violations that would cast doubt on the reliability of the relevant tests.  (*Id.* at pp. 68–71 & fns. 6–7.)  *Gerwig* therefore held that only proof of violations of title 17 that give rise to a reasonable inference that a rest result is unreliable will rebut the presumption that tests were properly conducted.  (*Id.* at pp. 62, 72.)

*Gerwig* further concluded that the supervisory violations the driver had established in that case did not meet its standard.  The driver first claimed broadly that there was "a nexus between approved procedures, appropriate supervision, and the proper conduct of a blood draw."  (*Gerwig, supra,* 61 Cal.App.5th at p. 68.)  The court found this true on an indirect level, "just as one could say that good nutrition and adequate rest are important to a phlebotomist's job performance," but found such factors on their own "too tenuous to cast doubt on the reliability of the blood test results."  (*Id.* at pp. 68–69.)  The court noted that title 17 includes some requirements, such as the requirements that a phlebotomist

always carry an identification card or that an administrator of a breath test receive a certificate with certain information, which are patently not connected to the reliability of tests. (*Id.* at p. 68, fn. 5.)

*Gerwig* also rejected the driver's attempt to compare an unsupervised phlebotomist to a piece of lab equipment that is misused. (*Gerwig, supra,* 61 Cal.App.5th at p. 71.) *Gerwig* reasoned that the phlebotomist who drew the driver's blood was "a person who presumably conducts blood draws, which he is trained to do, in the same way regardless of the general supervision he receives. While an unsupervised phlebotomist could make a mistake, so too could a properly supervised one." (*Id.* at p. 71.) The court found no reason to believe the phlebotomist made a mistake or that "the particular circumstance of [the driver's] blood draw presented a problem the lackluster supervision structure" at the phlebotomist's employer left the phlebotomist "ill equipped to address." (*Ibid.*) The court speculated that it might have reached a different result if, for example, the phlebotomist had tried unsuccessfully to reach a supervisor during the collection of blood to ask a question, since that would have implicated the requirement that a supervisor be accessible for consultation within 30 minutes during a phlebotomist's work. (*Id.* at p. 71, fn. 8.)

Phillips contends *Gerwig* was wrongly decided. She disputes *Gerwig*'s broader holding that only a violation of title 17 that relates to the reliability of a test will suffice to rebut the presumption that the test was performed in compliance with

regulatory and statutory standards. Phillips urges us to follow instead *Davenport*'s statement that evidence "that official standards were *in any respect* not observed" will rebut the presumption. (*Davenport*, *supra*, 6 Cal.App.4th at p. 144, italics added.) She also disagrees with *Gerwig*'s narrower holding concerning supervisory violations and reliability, maintaining that the court there took an unduly narrow view of what constitutes the reliability of a test. She faults *Gerwig* for focusing on accuracy, which refers to how close a measured value is to a standard or known true value, and ignoring precision, meaning how close multiple measurements are to each other. (See, e.g., *Gerwig*, *supra*, 61 Cal.App.5th at p. 62 ["It is not enough to show a violation of governing regulations that has only a tenuous connection to the *accuracy* of the results," italics added].) She contends both are required by title 17 and both are necessary for a test to be reliable, since a test must be not just accurate but dependably so, to exclude the possibility that a test merely described the correct amount of alcohol in a sample of blood by random chance. (Cf. tit. 17, § 1220.1, subd. (a)(1) [Methods for forensic alcohol analysis "shall be capable of the analysis of a reference sample of known alcohol concentration within accuracy and precision limits of plus or minus 5 percent of the value . . . . "].)

We begin by agreeing with *Gerwig* that a violation must relate to reliability to rebut the Evidence Code section 664 presumption and force the DMV to submit evidence of reliability. The precise nature of the presumption dictates this conclusion.

As explained in *Davenport*, "what is directly presumed is not the actual reliability of the test." (*Davenport, supra*, 6 Cal.App.4th at p. 144.) Rather, "what is actually presumed under Evidence Code [section] 664 is compliance with statutory and regulatory standards, which in turn gives rise to an inference of reliability." (*Ibid.*, italics omitted.) Proof that a test was completed in violation of a regulatory or statutory standard unrelated to reliability is therefore irrelevant because it would not meaningfully disrupt the inference that a test was reliable.

To use an example that *Gerwig, supra*, 61 Cal.App.5th at page 68, footnote 5, highlighted, if a driver proved that a phlebotomist failed to carry an identification card as required by Vehicle Code section 23158, subdivision (f), it would not meaningfully call into question whether the phlebotomist could be counted on to properly draw blood. This is because the identification card requirement on its face does not relate to reliability and appears to exist for other reasons, such as demonstrating to a driver or law enforcement officer that the phlebotomist is properly certified. On some level, one might infer from a phlebotomist's failure to comply with the identification card requirement that the phlebotomist might also fail to comply with substantive regulations for drawing blood. But this inference is weak because, as *Gerwig* pointed out, a conscientious and competent CPT could simply leave an identification card at home. (*Gerwig,* at p. 68.) Accordingly, *Gerwig*'s holding that proof of a violation must relate to reliability to rebut the presumption that a test was properly performed is sound.

We part company with *Gerwig*, however, on the question of whether the supervisory violations at issue there, as well as the initial competency verification and approval of procedures violation Phillips proved here, relate to reliability. *Gerwig* reasoned that a phlebotomist "presumably" draws blood in accordance with training regardless of the level of supervision and that a properly supervised phlebotomist can make a mistake just like an unsupervised one. (*Gerwig*, *supra*, 61 Cal.App.5th at p. 71.) The DMV takes a similar tack in emphasizing repeatedly that Ramos was a CPT, trained and certified by the Department of Public Health to draw blood samples.

A phlebotomist may be more likely to draw blood correctly despite a lack of supervision than a misused piece of laboratory equipment is to correctly report a test result, as *Gerwig* stated. (*Gerwig*, *supra*, 61 Cal.App.5th at p. 71.) But *Gerwig*'s reasoning calls into question why the supervision and competency evaluation requirements exist at all. Unlike the identification card requirement, there is no purpose for the supervision requirement other than to ensure that a CPT follows applicable rules and regulations. The supervision requirement indicates that a supervised phlebotomist is more likely to have drawn blood correctly than an unsupervised one. If the Legislature viewed a CPT's training and certification as a sufficient basis for confidence that the phlebotomist would draw blood the same way every time, or if unsupervised phlebotomists made errors at the same rate as supervised ones, it would not have required CPTs to be supervised. Accordingly, while the DMV can show that an

unsupervised phlebotomist drew blood correctly on a given occasion (as we conclude, *post*, it has in this case), only a phlebotomist supervised in accordance with the statutory and regulatory requirements can be *presumed* under Evidence Code section 664 to have done so.

*Gerwig*'s comparison between the supervision requirements and good nutrition and adequate rest actually serves to demonstrate the point. (*Gerwig*, *supra*, 61 Cal.App.5th at pp. 68–69.) Good nutrition and rest can be fairly said to have a tenuous connection to reliability of a blood test. But the Legislature did not mandate nutrition or rest requirements in Vehicle Code section 23158. It did, however, include supervision requirements in the statute. It must have had a good reason to do so. Courts should therefore treat a lack of supervision differently than a lack of rest or proper nutrition.

## 2. Legislative history

To the extent that the statute is ambiguous on this point, the history of the CPT certification and the general supervision requirement confirm that the supervision requirements relate to the reliability of CPTs' work. The Legislature created the CPT certification in 1999. (Stats. 1999, ch. 695, § 3, pp. 5055–5056.) Under existing law at that time, unlicensed personnel employed by a licensed clinical laboratory could draw blood so long as (1) the person worked under the supervision of a certain type of qualified individual and the supervisor was physically available to be summoned during a blood withdrawal within five minutes, and (2) a certain kind of qualified individual had trained the

unlicensed person for at least ten hours.  (Bus. & Prof. Code, former § 1246, subds. (a)–(b), as amended by Stats. 1978, ch. 429, § 9, pp. 1332–1333; tit. 17, former § 1034, subds. (a)–(b), Register 1975, No. 50 (Dec. 13, 1975); see also Assem. Com. on Health, Analysis of Assem. Bill No. 1557 (1999–2000 Reg. Sess.) as introduced, pp. 1–2 (Assembly Committee on Health Analysis).)

In part because of an incident in which a phlebotomist admitted to reusing needles, the Legislature became concerned that inadequate training of phlebotomists could lead to "inaccurate or invalid diagnosis of patients' medical conditions, inaccurate treatment as a result of inaccurate diagnosis, physical injuries to patients ranging from bruising to paralysis, and exposing workers and patients to blood-borne diseases and viruses such as hepatitis B, hepatitis C, or HIV." (Assem. Com. on Health Analysis, *supra*, at pp. 2–3.)  The Legislature therefore directed what is now the Department of Public Health to adopt regulations for CPT certification of employees drawing blood in a clinical laboratory, which were to include that a CPT had to obtain a certification from a national accreditation agency, complete at least 40 hours each of didactic and practical training, be found competent by certain qualified individuals, and work under the supervision of certain qualified individuals or their designee.  (Bus. & Prof. Code, former § 1246, subd. (b)(1), (b)(2)(A)–(B), (4)–(5), as amended by Stats. 1999, ch. 695, § 3, p. 5056; Bus. & Prof. Code, § 1202.)  The supervision requirement for CPTs did not mention any need for the supervisor to be available within a certain amount of time.  (Bus. & Prof. Code,

former § 1246, subd. (b)(5), as amended by Stats. 1999, ch. 695, § 3, p. 5056.)

The implementing regulation, which is still in effect, allows CPTs to draw blood only if they maintain a valid state CPT certification, work under the supervision of a qualified individual or designee, have shown competency to draw blood without direct and constant supervision, and have such competency documented annually. (Tit. 17, § 1030, subd. (b)(2)(A)–(C).)[7] A CPT's supervisor must review the CPT's work monthly and be accessible to the CPT's worksite to provide on-site, telephone, or electronic consultation as needed. (Tit. 17, § 1030, subd. (b)(2)(B).)

In 2004, the Legislature enacted Assembly Bill No. 371 (2003–2004 Reg. Sess.) (Assembly Bill 371) to amend Vehicle Code section 23158 so that CPTs could draw blood in the field for alcohol testing for law enforcement.[8] (Stats. 2004, ch. 14, § 2; Assem. Com. on Public Safety, Analysis of Assem. Bill 371 (2003–2004 Reg. Sess.) as amended Mar. 26, 2003, at pp. 2, 4–5

---

[7] This regulation was originally enacted at title 17, section 1034, Register 2003, No. 2 (Jan. 10, 2003). In 2022, the regulation was renumbered as section 1030, without substantive change. (Tit. 17, § 1030, Register 2022, No. 40 (Oct. 4, 2022).) We cite to the current numbering of the regulation regardless of the time period at issue.

[8] Assembly Bill 371 also added similar language to Business and Professions Code section 1246, the statute that created the CPT certification. (Stats. 2004, ch. 14, §§ 1, 3.) For simplicity, we focus on the amendment to Vehicle Code section 23158, but the changes to Business and Professions Code section 1246 evolved in the same way.

(Assembly Committee on Public Safety Analysis).)  The author of Assembly Bill 371 stated that law enforcement was experiencing difficulty getting routine blood withdrawals in the field in DUI cases.  (Assem. Com. on Public Safety Analysis, *supra*, at p. 2.) Phlebotomists could not draw blood in the field unsupervised and the individuals who could, such as physicians and nurses, were difficult and costly to recruit and retain.  (*Ibid.*)  The bill aimed to make it cheaper for law enforcement to get blood tests by allowing CPTs to draw blood in the field.  (*Ibid.*)

An early version of Assembly Bill 371 would have done this by allowing CPTs to draw blood at the request and in the presence of a peace officer "in any location and without supervision," thereby essentially transferring the requirement of supervision by a qualified individual to supervision by a peace officer.  (Assem. Amend to Assem. Bill 371, Mar. 26, 2003, § 2; Assem. Com. on Public Safety Analysis, *supra*, at p. 5.)  A committee analysis of this version of the bill noted, however, that peace officers are not usually medically trained.  (Assem. Com. on Public Safety Analysis, *supra*, at p. 5.)

Ensuing amendments to the bill considerably restricted the scope of CPTs' authority in the early draft and gave the statute its current form.  One Assembly amendment changed the bill to allow CPTs to draw blood at the request of a peace officer only in a jail, law enforcement facility, or medical facility and only with "general supervision," meaning oversight by a licensed medical professional.  (Assem. Amend to Assem. Bill 371, Apr. 29, 2003, § 2; Assem. Com. on Public Safety, Analysis of Assem. Bill 371

(2003–2004 Reg. Sess.) as amended Mar. 26, 2003, at p. 4.) The Assembly amendment defined "general supervision" to mean: (1) the CPT's supervisor is a qualified individual; (2) the qualified supervisor reviews the CPT's competency before the CPT can perform blood withdrawals without direct supervision and annually thereafter; (3) the qualified supervisor reviews the CPT's work monthly to ensure compliance with policies, procedures, and regulations; and (4) the qualified supervisor or another qualified individual is accessible to the CPT's worksite to provide onsite, telephone, or electronic consultation if needed. (Assem. Amend. to Assem. Bill 371, Apr. 29, 2003, § 2.) However, this amendment also added the language currently found in Vehicle Code section 23158, subdivision (h) making clear that CPTs did not need "to be associated with a clinical laboratory or to be directly supervised after competency has been established." (*Ibid.*) The Senate amended the new definition of general supervision to require a qualified individual to be accessible to a CPT for consultation within 30 minutes. (Assem. Amend to Assem. Bill 371, May 21, 2003, § 2.) Another Senate amendment added the language in Vehicle Code section 23158, subdivision (e) requiring a CPT drawing blood for alcohol testing to follow a procedure approved by a physician or surgeon for the location where the blood was being drawn. (Sen. Amend. to Assem. Bill 371, Sept. 8, 2003, § 2.) The current statute reflects the language of these amendments. (Veh. Code, § 23158, subds. (e), (g), & (h).)

This legislative history confirms that *Gerwig* should have treated the supervision requirements as related to the reliability

of the collection of blood. The Legislature created the CPT certification because of concerns about the reliability of phlebotomists' work, and it did not treat CPTs' training and certification as sufficient guarantees of reliability. It instead allowed CPTs to draw blood so long as they complied with the requirements of qualified supervision, annual demonstrations of competence, and monthly review of work. A CPT who draws blood in violation of these requirements therefore acts beyond the scope of the authority the Legislature conferred.

When the Legislature later created an exception to these requirements to allow CPTs to draw blood for alcohol testing without direct supervision outside of laboratories, it considered and rejected a proposal that would have freed CPTs from medical supervision entirely and allowed them to work anywhere. It instead circumscribed the locations where CPTs could operate, maintained the requirement that CPTs continue to be supervised by qualified individuals, restored a requirement that a CPT's supervisor in such circumstances must be available in a certain amount of time, and added an additional requirement that CPTs drawing blood for alcohol testing must follow a procedure approved by a physician or surgeon. It did this precisely so that CPTs would operate under oversight by medical professionals. The approval of procedures and supervision requirements in Vehicle Code section 23158, subdivisions (e) and (g) are integrally related to the reliability of CPTs' work, not extraneous to it.

Our conclusion that these requirements relate to reliability is consistent with *Coombs v. Pierce* (1991) 1 Cal.App.4th 568.

The DMV there did not submit foundational evidence of the reliability of the breath testing machine used to determine the driver's BAC and instead relied on the fact that the machine was included on a list of devices that a regulation permitted to be used. (*Id.* at pp. 576–578, 580.) *Coombs* determined the machine's inclusion on the list was not evidence of reliability and did not shift the burden to the driver to overcome the test's presumed reliability because the driver submitted evidence that the county laboratory that used the device was not licensed to do so. (*Id.* at pp. 579–581.) The court therefore held that there was not substantial evidence to uphold the suspension of the driver's license. (*Id.* at p. 581.)

The situation here is analogous to *Coombs* in that Ramos was acting beyond the scope of her authority under Vehicle Code section 23158, like the laboratory that operated a device without a license, because she was not properly supervised or operating pursuant to a properly approved procedure. When withdrawing Phillips' blood, Ramos cannot be presumed to have followed regulations when it was demonstrated that she had acted beyond the authority conferred by those regulations.

*Shea v. Department of Motor Vehicles* (1998) 62 Cal.App.4th 1057 also supports our conclusion. *Shea* held that the Evidence Code section 664 presumption did not apply to a BAC test report prepared by trainees who signed a statement that they followed title 17. (*Id.* at p. 1060–1061.) The court noted that trainees could only perform forensic analysis when supervised, there was no evidence the trainees were supervised, and a trainee has no

official duty to report test results.  (*Id.* at pp. 1059–1061.)  It therefore concluded that the trainees' compliance with that duty could not be presumed.  (*Id.* at p. 1061; see also *Manning v. Department of Motor Vehicles* (1998) 61 Cal.App.4th 273, 275–276 & fn. 3 [same].)  Here, Ramos' authority and duty under Vehicle Code section 25158, subdivisions (e) and (g) was to draw blood only under general supervision and pursuant to a properly approved procedure document.  She drew Phillips' blood without the proper supervision or procedure, so she was acting beyond the scope of her duty.  The DMV therefore cannot rely on a presumption that she properly performed her official duty.

### B.  *Foundational evidence of reliability*

Because we agree with Phillips that the violations she established relate to reliability, her proof of those violations rebutted the presumption that her blood sample was collected in accordance with title 17.  This shifted the burden back to the DMV to provide evidence of the foundational elements of (1) proper equipment, (2) proper collection procedures, and (3) a competent and qualified collector.  (*Davenport*, *supra*, 6 Cal.App.4th at pp. 140, 144; *Williams*, *supra*, 28 Cal.4th at p. 417.)

Phillips asserts that reversal is required because the DMV failed to provide the necessary evidence.  To establish the first two elements, Phillips argues the DMV needed to show the blood collection complied with the requirements in title 17, section 1219.1.  On the third element, Phillips argues that the approval of procedures and supervisory violations make it impossible for

the DMV to establish that Ramos was competent and qualified. She contends the lack of properly approved procedures and qualified supervision, especially the pre-collection competence review required by Vehicle Code section 23158, subdivision (g), made Ramos not qualified as a matter of law.

The premise of Phillips' arguments is the notion that full compliance with title 17 is required to establish the three foundational elements of reliability. This is incorrect, as *Williams* held. The Supreme Court there adopted the holding of *People v. Adams* (1976) 59 Cal.App.3d 559. (*Williams*, *supra*, 28 Cal.4th at p. 417.) As summarized by the Supreme Court, "Rather than equate the regulatory standards with the minimum showing of reliability, *Adams* expressly held that title 17 compliance and the tripartite foundational requirements were *distinct and independent means* to support the admission of test results." (*Ibid.*, italics added.) "[A]lthough the regulations are a standard of competency, they are not the only standard. Even absent compliance with the regulations, the People could obtain admission of the evidence through the general foundational requirements . . . . " (*Id.* at p. 416, italics omitted.) This is because "[c]ompliance with regulations is sufficient to support admission, but not necessary." (*Id.* at p. 414.) The Supreme Court therefore concluded that the foundational requirements for reliability of a test "are not coextensive with the title 17 regulations" so that test results—breath test results, in that case—"are admissible upon a showing of *either* compliance with title 17 *or* the foundational elements of (1) properly functioning

equipment, (2) a properly administered test, and (3) a qualified operator . . . . " (*Id.* at p. 417, italics added.)[9]

In light of *Williams*, full compliance with title 17 is not required to establish the three foundational elements of reliability. (Gov. Code, § 11513, subd. (c) [in administrative hearings, "[a]ny relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions"]; *Lake v. Reed* (1997) 16 Cal.4th 448, 467 [applying Gov. Code § 11513 to DMV administrative hearing].) Evidence of partial compliance with title 17 can help establish the foundational elements, as can any other relevant evidence.

It is true that the DMV did not supply much foundational evidence here. However, Phillips herself did so, since she introduced an exhibit that contained copies of several forms Ramos completed when she drew Phillips' blood and certain records from Ramos' employer. We agree with the DMV that this

---

[9] *Williams* also rejected the notion that courts should adopt an exclusionary rule to deter or punish law enforcement's indifference to the regulations, holding that the California Constitution establishes that "excluding evidence is not an acceptable means of deterring police misconduct" unless required by the federal Constitution. (*Williams, supra,* 28 Cal.4th at pp. 414–415.) The only proper question is whether test results are reliable and therefore relevant. (*Ibid.*) Importantly, the court made clear that "[n]oncompliance [with title 17] goes only to the weight of the evidence, *not its admissibility.*" (*Id.* at p. 414, italics added.)

evidence met the three foundational requirements under *Williams* and Phillips did not impeach the evidence or introduce any contrary evidence.[10]

On the first element, proper equipment, section 1219.1 of title 17 requires blood samples to be collected "using sterile, dry hypodermic needles and syringes, or using clean, dry vacuum type containers with sterile needles" and the blood to "be deposited into a clean, dry container which is closed with an inert stopper." (Tit. 17, § 1219.1, subds. (c)–(d).) The same regulation further requires that the container not have been cleaned with alcohol. (*Id.,* subd. (d)(1).)

A checklist that Ramos and the CHP officer initialed during the collection of Ramos' blood describes the equipment Ramos used. One entry indicates that Ramos began the blood withdrawal by opening a sealed plastic envelope supplied by the San Mateo County Forensic Lab containing a vacutainer needle holder, a sealed sterile needle, and two vacutainer tubes containing dry white powder. The CHP officer's report likewise states that Ramos took a needle out of a sealed package. These descriptions of the equipment used match the regulatory requirements. Additionally, the report of the test on Phillips' blood states that the sample appeared to be in compliance with title 17.

---

[10] The trial court denied Phillips' petition based on *Gerwig* and did not consider whether the record contained sufficient foundational evidence of reliability. However, we must affirm a trial court ruling if it is correct on any ground. (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 278, fn. 5.)

On the second element, proper collection procedures, title 17, section 1219.1 requires blood to be drawn by venipuncture as soon as feasible after an offense. (Tit. 17, § 1219.1, subd. (a).) It further requires that alcohol not be used to clean the skin where blood is collected and that the collected blood be mixed with an anticoagulant and a preservative. (*Id.,* subds. (b), (d)(2).) The checklist shows Ramos followed all of these procedures, since it indicates that Ramos cleaned the venipuncture site in Phillips' right arm with the non-alcohol sterile swab supplied by the county laboratory, drew blood from a vein, and confirmed afterwards that the blood was venous. The CHP officer's report similarly states that Ramos cleaned Phillips' arm with a non-alcoholic cleanser. Ramos checked a box on the sample collection envelope indicating that the disinfectant she used was Povidone-Iodine, and a photo of a sample collection kit confirms that this was the type of antiseptic wipe provided. Ramos drew the blood at 1:07 a.m., which was less than two hours after the officer pulled Phillips over. Another item on the checklist, which Ramos and the officer initialed, showed that after drawing the blood Ramos inverted the tubes to dissolve the preservative and coagulant. Besides confirming that Ramos mixed the blood as required, this indicates that the dry white powder contained in the tubes when Ramos unsealed them was the necessary coagulant and preservative, not a contaminant.[11]

_____

[11] The checklist also showed that Ramos followed various other procedures relating to the labeling of the samples, the chain of custody, and appropriate care for the venipuncture site on Phillips' arm.

Finally, on the third element, a competent and qualified collector, Ramos' CPT certification supplies some evidence of her competence and qualification, despite her lack of qualified supervision, since her CPT training and certification made her more qualified to draw blood than someone without the certification and training.  Other evidence in the record corroborates Ramos' qualifications and competence.  The evidence that Ramos followed the procedures cited by Phillips helps demonstrate Ramos' competence.  In addition, Ramos passed a test when she was hired, and her supervisor, who was himself a CPT, observed Ramos draw blood and attested to her competence before she was allowed to draw blood without direct supervision. Ramos also had significant experience as a phlebotomist.  She had been a CPT for almost 12 years when she drew Phillips' blood.  She had worked in a laboratory for at least one year or completed a phlebotomy externship, since her employer required at least one of those types of experience before hiring her.

Taken together, this evidence constitutes substantial evidence that Ramos was qualified and competent to draw Phillips' blood, notwithstanding her lack of title 17-compliant supervision, and did so using the proper equipment and following the prescribed procedures.  Phillips focused solely on rebutting the presumption of compliance with title 17 and offered no evidence or impeachment to suggest that Ramos' collection of Phillips' blood was unreliable in any way.  The record therefore demonstrates as a matter of law that the collection and testing of Phillips' blood was reliable, and the trial court was correct to

deny Phillips' petition seeking to direct the DMV to rescind and set aside the order suspending her driver's license.

## DISPOSITION

The judgment is affirmed.

BROWN, P. J.

WE CONCUR:

STREETER, J.
GOLDMAN, J.

*Phillips v. Gordon, Director of California Department of Motor Vehicles* (A165289)

Trial Court:        San Mateo County Superior Court

Trial Judge:       Hon. Danny Y. Chou

Counsel:           Law Office of A. P. Zmurkiewicz, A. P. Zmurkiewicz
                   for Plaintiff and Appellant.

                   Rob Bonta, Attorney General, Chris Knudsen,
                   Assistant Attorney General, Fiel D. Tingo,
                   Joshua C. Irwin, Deputy Attorneys General for
                   Plaintiff and Respondent.